# SEALED

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

Clerk, U.S. District Court
Southern District of Texas
FILED

MAY 0 8 2015

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* | § |
| JANE DOE  and JANE ROE, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | § |
| | § |
| MERIDA HEALTH CARE GROUP, | § |
| ILLUMINA, LLC, and RODNEY | § |
| MESQUIAS, | § |
| | § |
| Defendants. | § |

Civil Action No. 2:15 CV 208

## **COMPLAINT OF THE UNITED STATES**

### **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

The United States of America ("United States" or the "Government"), by and through its *qui tam* Relators, Jane Doe and Jane Roe, bring this action under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA") against Merida Health Care Group ("Merida" or the "Company"), Illumina, LLC ("Illumina") and Rodney Mesquias ("Mesquias") (collectively, "Defendants") to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the United States and the Relators, and for their complaint allege:

1. Based on the Relators' personal knowledge and further investigation, sufficient evidence, including statements by the Relators as well as documents and other information they have obtained, exists to allege that Defendants have violated and continue to violate the False Claims Act, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute" or "AKS"), by: (1) using fabricated and ineligible generic diagnoses to recertify patients for hospice care; (2) enrolling and recertifying patients who do not meet the requirements for hospice care; (3) falsifying documents to support the admission, certification, and recertification of its patients; and (4) paying kickbacks to patients to sign up to receive Illumina's hospice services.

## PARTIES

2. Jane Doe ("Relator 1") served as a Medical Records Technician at Illumina from mid-2014 until early-2015. Relator 1's responsibilities included assembling patient information/ documentation, verifying eligibility and compliance, scheduling, and electronic record entry.

3. Jane Roe ("Relator 2") is a Certified Hospice and Palliative Care Administrator ("CHPCA") with approximately 20 years of hospice administration experience. Relator 2 served as Illumina's Intake Coordinator from June until September 2014. Relator 2's responsibilities included processing patient referrals, verifying payment sources, scheduling and electronic medical record maintenance.

4.      Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare").

5.      Defendant Merida is a Texas home health and hospice company.  Merida owns Illumina, as well as Professional Hospice, Inc. in Laredo, TX, Bee Caring, LLC in San Antonio, TX, Bee Caring Hospice Health Care, Inc. in Harlingen, TX, Outreach Health Services of San Antonio in San Antonio, TX, BRM Home Health, PLLC in Harlingen, TX, Virtue Home Health, Inc. in Corpus Christi, TX, and Well-Care Home Health, Inc. in Houston, TX.

6.      Defendant Illumina is a community hospice based in Corpus Christi, Texas, with a census of approximately 70 patients.  Anita Martinez ("Martinez"), Administrative Assistant/Head Intake Coordinator, and Beth Guebara, Director of Nursing, oversee Illumina's day-to-day operations.  At all times relevant, upon information and belief, all of Illumina's patients were insured through Medicare or Medicaid.

7.      Defendant Mesquias, a Registered Nurse ("RN"), is Merida's Chief Executive Officer ("CEO") and, upon information and belief, its sole owner.

## JURISDICTION AND VENUE

8.      Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

9.      The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.*, and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

10. Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and will serve the complaint on the Attorney General of the United States, and the United States Attorney for the Southern District of Texas, as well as a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims. Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## **LEGAL BACKGROUND**

### *The False Claims Act*

11. The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud

the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

5

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

12.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

*The Anti-Kickback Statute*

13.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A) and (B), prohibits offering to pay or paying any remuneration to any person to induce such person "to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program" or "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." *Id.*

6

14.     A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7b(b).  The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the Anti-Kickback Statute. 42 U.S.C. § 1320a-7a(a)(7) and (10).

15.     Importantly, although the Anti-Kickback Statute does not afford a private right of action, the False Claims Act provides a vehicle whereby individuals may bring *qui tam* actions alleging violations of the Anti-Kickback Statute.  *See* 31 U.S.C. §§ 3729-3733.

16.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA.  42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the FCA]. . . .").

17.     The Anti-Kickback Statute was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA.  42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

## FACTUAL BACKGROUND

### I.   Overview of Medicare and Medicaid and Their Benefits

18.    Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

19.    The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v is a government insurance program for persons of all ages whose income and resources are insufficient to pay for health care.  Medicaid is the largest source of funding for medical and health-related services for people with low income in the United States.  It is a means-tested program that is jointly funded by the state and federal governments and managed by the states.

20.    HHS and CMS administer Medicare and Medicaid.

21.    The Medicare hospice benefit was established by Congress in 1982.  The hospice benefit is intended to provide palliative care to individuals who have six months or less to live and who elect to forgo further curative treatment of a terminal illness.  Today, Medicare is the predominate source of payment for hospice services.  According to the National Hospice and Palliative Care Organization ("NHPCO"), in 2012, as compared to other payment sources, nearly 84% of hospice patients were covered by Medicare.  In 2011, Medicare paid $13.7 billion for hospice care for 1.2 million beneficiaries.

22.    Palliative care is aimed at relieving pain, symptoms, or stress of terminal illness.  It includes a comprehensive set of medical, social, psychological, emotional, and spiritual services provided to a terminally ill individual.  Medicare recipients who elect hospice care agree to forego curative treatment of their terminal illnesses.  In other words, patients who receive the Medicare hospice benefit no longer receive care that leads to a cure of their illnesses.

23.    To be eligible for Medicare's hospice benefit, Federal law requires that a

beneficiary must be: (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22. According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectance is 6 months or less if the illness runs its normal course." *See* Social Security Act, §§ 1814(a)(7)(A) and 1861(dd)(3)(A); 42 C.F.R. § 418.20 and 418.22.

24.     Hospice care is given in benefit periods. A patient can receive hospice care for two initial 90-day periods followed by an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period. A benefit period starts the day the patient begins to get hospice care and it ends when the 90-day or 60-day period ends. At the start of each period, the hospice medical director or other hospice doctor must certify or recertify that the patient is terminally ill, so that the patient can receive hospice care.

25.     Certification for hospice services occurs when a physician completes a Certification of Terminal Illness for the patient. Specifically, the first 90-day period of hospice care begins once the individual's attending physician (as defined in section 1861(dd)(3)(B) of the Social Security Act), and the medical director (or physician member of the interdisciplinary group ("IDG") described in section 1861(dd)(2)(B)) of the hospice program providing (or arranging for) the care, each certify in writing, at the beginning of the period, that the individual is terminally ill (as defined in section 1861(dd)(3)(A)), and based on the physician's or medical director's clinical judgment has six months or less to live if the individual's illness were to run its normal course. *See* Social Security Act, 42 U.S.C. § 1814 (a)(7). In addition, the written certification requires specific clinical findings and other documentation supporting a life expectancy of six months or less and the signatures of the physicians. 42 C.F.R. § 418.22; Medicare Benefit Policy Manual ("Policy

Manual"), Chapter 9, § 20.1.

26.     A Certification of Terminal Illness is again required for the subsequent 90-day period and each 60-day period thereafter, however, for subsequent periods, a written certification statement is required only from the medical director of the hospice or the physician member of the hospice's IDG.   42 C.F.R. §§ 418.21 and 418.22; Policy Manual, Chapter 9, §§ 10 and 20.1. Moreover, effective January 1, 2011, a hospice physician or nurse practitioner must have a face-to-face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period.  *Id.*  The face-to-face encounter must occur prior to, but no more than 30 calendar days prior to, the 3rd benefit period recertification, and every benefit period recertification thereafter, to gather clinical findings to determine continued eligibility for hospice care. *Id.*

27.     Hospices providing care to government health care beneficiaries must maintain a clinical record for each hospice patient that contains "correct clinical information."  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated . . . ." 42 C.F.R. § 418.104.  Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

28.     Moreover, all Medicare and Medicaid certified hospice providers are required to comply with Medicare regulations and federal and state laws that govern the provision of hospice services.   A failure to comply with these regulations and laws may cause a provider to be disqualified from participation in a federal or state healthcare program.

29.     Hospices are paid a per diem rate based on the number of days and level of care provided during the election period.  Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302.  To be covered, hospice services must be:

> Reasonable and necessary for the palliation and management of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with § 418.24. A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200 (requirements for coverage).

30.     Hospice providers obtain Medicare reimbursement by completing a CMS-1450 or UB-04 form.  Among other information, this form must be completed to include the patient's identity, principal diagnosis, dates of the patient's certification and recertification of terminal illness, the location of the hospice services, and the level of services that were provided, *i.e.* routine care, continuous care, respite or general inpatient care.  The claim form requires the provider to certify that the claim is "correct and complete," and the requisite supporting documentation is being done and maintained.  After a provider submits a claim form to the Medicare Administrative Contractors ("MAC") or fiscal intermediary, the claim is paid directly to the hospice provider.

31.     Federal law prohibits providers from retaining any overpayments.  Overpayments are funds received or retained to which a provider is not lawfully entitled.  *See* 42 U.S.C. § 1320a-7k(d)(4)(B).  Overpayments must be returned either 60 days after the date on which the overpayment was identified or the date any corresponding cost report is due, if applicable.  *Id* at (d)(2).  If not returned on a timely basis, overpayments are the basis of liability under the False Claims Act.  *Id* at (d)(3).

### III.   Defendants' Fraudulent Scheme

#### A.   False Claims Act Violations

32.   Defendants violated the FCA by implementing a host of policies and procedures to ensure patients stayed in their care, despite the fact that few met the requisite eligibility criteria. According to Relators, Defendants, through Illumina, are defrauding Medicare on a regular basis by submitting claims for hospice care purportedly rendered to ineligible patients and falsifying required documentation. Specifically, Defendants: (1) used fabricated and ineligible generic diagnoses to recertify patients for hospice care; (2) enrolled and recertified patients who do not meet the requirements for hospice care; (3) falsified documents to support the admission, certification, and recertification of its patients; and (4) paid kickbacks to patients to sign up to receive Illumina's hospice services.

#### 1.   Defendants Knowingly Provide Hospice Care to Unqualified Patients

33.   According to Relators, Illumina is defrauding government health care programs by knowingly providing hospice care to government health care beneficiaries who do not meet the eligibility requirements to receive hospice care. As a result, Defendants violated the False Claims Act by submitting and receiving payment by government health care programs for hospice claims provided to these ineligible patients.

34.   According to Relators, Defendants' sole focus at Illumina was increasing its patient census. In fact, during Relator 2's initial job interview, Merida's owner Mesquias stated that "we do whatever it takes to get patients on" because "it's all about census." For example, according to Relator 1, in May 2014, Illumina's patient census was approximately 25. However, Relator 1 states that by November 2014 Ilumina's patient census had grown to approximately 70 patients.

35.   According to Relators, one way Illumina increased its census was through referrals

it received from Merida's other companies, mainly its home health and unskilled care divisions. The hospice, home health, and unskilled care divisions of Merida would "feed each other," meaning these different divisions would refer patients to the other divisions. For example, if Illumina's patient census was low, Merida's home health and unskilled care divisions were expected to refer patients for hospice care at Illumina. This was done solely to increase Illumina's patient census, and was rarely of any benefit to the patient. When Merida referred a patient for hospice care, Illumina would admit the patient and then, according to Relators, "see what they could find," meaning Illumina staff would search for a reason to qualify the patient for hospice care after admitting. If Illumina was unable to find a reason to keep the patient on hospice care, it would discharge the patient at the end of the 90-day period.

36. The self-referral system at Merida also caused Illumina to bill government health care programs for unrendered services. Many of the patients referred to Illumina from other Merida-owned health care companies did not require, much less qualify for, hospice care. As a result, Illumina did not provide these patients hospice care. Rather, the self-referred patients continued receiving the same care – home health or unskilled care – and were only on hospice care for billing purposes. Indeed, according to Relators, in many instances, patients referred by a company within the Merida network and admitted into hospice would continue to receive visits by aides who would simply provide unskilled care. In many instances, Merida provided the exact same type and level of care after the patient was converted from home health care to hospice care. In other words, once a patient was converted from home health care to hospice care there was no increase or change in the care and services provided. By doing this, Defendants were able to collect larger payments for hospice care from government health care programs while, in reality, providing patients with a less expensive level of care.

37.     According to Relators, during their employment with the Company, the Merida self-referrals were openly discussed at Illumina's staff meetings, which were held every Monday. These meetings were attended by representatives from Illumina and the Corpus Christi area Merida skilled and unskilled home health and personal care services offices.  The main focus of such meetings was to discuss census, and to reiterate instructions that Merida-owned companies needed to "feed each other" patients to keep census high.

38.     Relator 1 confirms that a large percentage of Illumina's patients do not qualify for hospice care, based on her experience and training, reviews of patient records and conversations with Illumina field nurses.  According to Relator 1, admissions at Illumina were "all about the diagnosis code, even if you had to stretch it."  Specific examples of the foregoing follow.

39.     Patient J.B. ("J.B.") was an Illumina hospice patient from January to December 2014, and was diagnosed with end stage renal failure.  In December 2014, Patricia Copeland, RN ("Nurse Copeland"), and a nurse from a Merida home health office called on J.B. for a recertification, at which time she discovered that: (a)  J.B. was not on nor did he need dialysis; and (b) that J.B. had never received a face to face encounter with a physician or nurse practitioner. Nurse Copeland then discharged J.B. to home health care (after a year on hospice care), where he continues to this day, without dialysis.

40.     Another patient, M.C. ("M.C."), is receiving hospice care for terminal mesothelioma.  As part of the verification process, Relator 1 ordered and reviewed M.C.'s radiographs that purportedly supported his diagnosis.  Upon review, Relator 1 realized that the x-rays/reports "did not show anything."  Relator 1 discussed this patient with Illumina field nurse Renée Laird, who confirmed that there was nothing in M.C.'s file to support his purported diagnosis and basis for hospice care.  Another Illumina field nurse, Marianne Chavez, later agreed,

stating that "M.C. was so healthy that he still even mowed his own lawn."

41.    Similarly, patient Y.P. ("Y.P.") was diagnosed with breast cancer, but then underwent surgery that was successful in removing the existing cancer.  Notwithstanding, Y.P. was admitted to Illumina's hospice care because her (former) diagnosis was a reimbursable one – not because she was still sick or in need of hospice care.

42.    According to Relators, Defendants also sustained and increased Illumina's patient census by repeatedly admitting and discharging "frequent flyer" patients.  These were patients who did not meet the eligibility criteria for hospice care but who agree to receive hospice care for any number of reasons, if asked.  For example, patient J.A. ("J.A.") would accept invitations for hospice care at Illumina in an effort to obtain drugs.  If he then actually became sick, J.A. would present to the hospital for admission.  Illumina would discharge him from hospice, and then readmit him once the hospital discharged him.  According to Relators, this happened repeatedly.

43.    Similarly, according to Relator 2, patient I.D. ("I.D.") was discharged and readmitted at least three times.  And P.T., a morbidly-obese patient, who received hospice care for years, not because she needed it – indeed, she may have suffered from it – but because she would not say no (or request home health care).

44.    The active lifestyle exhibited by many of Illumina's patients also demonstrates that Defendants are providing hospice care to unqualified patients.  Indeed, according to Relators, many of Illumina's "terminally ill" patients live active lifestyles.  For example, according to Relator 2, Illumina's nurses must go to the local senior center or park to call on long-time patient J.C. ("J.C.").  Every day J.C. can be found at these locations (or driving to and from one or the other) between 10 am and 2 pm.  Illumina patients L.P. ("L.P.") and E.O. ("E.O."), both of whom are on hospice care for liver cirrhosis, are almost never home for treatment.  In fact, E.O. is well

known for spending his time at the local bar when he is not home. And while homebound status is not an explicit pre-requisite for hospice qualification, it is hard to believe that patients living such a lifestyle qualify for, and are correctly certified by their physicians with, a diagnosis of less than six months to live.

45.     Defendants place a great deal of pressure on Illumina's marketing representatives to seek out and admit patients who do not qualify for hospice care under Medicare regulations. Relators, due to their positions at Illumina, worked closely with the Company's marketing representatives and were therefore able to witness Defendants' coercive practices first hand. Defendants assign Illumina's marketing representatives a quota for patient admissions. Relator 1 believes that Illumina's marketing representatives were each required to obtain 8 new admissions per month.    According to Relator 2, Illumina placed "huge pressure" on its marketing representatives to make sure their quotas were met; and if they were not they would be fired.

46.     Relator 1 recalls instances where Merida's home health offices were unable to qualify patients for home health services. The names of these patients would then be passed along to Illumina's marketing representatives who would put these patient names in a hat.   Then, marketing representatives would draw a name from the hat to see if they could "do something with them." The goal was to get patients, who were not sick enough to qualify for home health services, admitted for hospice care at Illumina.

47.     One example of such a patient is K.K. ("K.K."). According to Relator 1, K.K. received personal care services through Merida until, for unknown reasons, she was designated for conversion to hospice care. Illumina assigned RN, Amy Waffard ("Nurse Waffard"), to convert K.K. to hospice care. Nurse Waffard resisted, however, because K.K. did not meet the eligibility criteria for hospice care.  However, Nurse Waffard relented due to pressure from Illumina

management.  Illumina's marketing representatives, in an attempt to compound on their success with K.K., also tried, unsuccessfully, to have K.K.'s son admitted to hospice care under a purported diagnosis of COPD.

48.     Whenever Illumina's marketing representatives were successful in admitting an unqualified patient to hospice care, Defendants instructed the representatives to use tricks to help conceal their fraud.  Specifically, according to Relator 2, in situations where marketers had convinced a patient to accept hospice care but whose condition did not qualify them for such care, the marketers were instructed to tell the patient that he or she was no longer allowed to remain a patient of his or her existing doctor, due to fear that the patient's existing doctor would inform the patient that hospice care was unnecessary.

49.     Nurse Waffard was not the only Illumina nurse to resist Defendants' instructions to admit ineligible patients.  Indeed, according to Relator 2, nurses would regularly object to Defendants' directives to provide care to ineligible patients.  For example, Josie Peebles, RN, would complain at staff meetings about keeping patients like I.D. on hospice care.  Moreover, nurses complained about – and often refused to visit – J.A. because his medical condition did not require hospice care.  In response, defendant Mesquias, personally, responded "bring him back on, he's already dying, let him do what he wants," according to Relator 1.  Further, in or around late 2014, Illumina hired a new nurse, Sonja Zinsmeyer, who immediately noted that she was assigned patients that did not need and were not qualified for hospice care.  In response to such protests, Defendants told these "complainers" "we do things our way."

### 2. Defendants Bribed Patients to Select Illumina as Their Hospice Provider in Violation of the Anti-Kickback Statute

50.     Defendants bribed patients and/or their families to induce them to select Illumina as their hospice provider.  Specifically, according to Relators, Defendants instructed Illumina's marketing representatives to offer and provide bribes to patients and/or their families in return for their selection of Illumina as their hospice provider.

51.     One method Defendants used was to instruct marketing representatives to lure prospective patients with the promise of free "house call" care.  This meant that Illumina marketing representatives would tell the prospective patient that the hospice physicians would act as their primary care physicians and not only continue to treat their day-to-day ailments but also do so in the patients' respective homes.  On several occasions, when the physicians did not perform the visits the marketers promised, patients would call Relator 2 to complain and/or revoke consent.

52.     It is beyond reasonable dispute that the above described directives came from the most senior management at Merida.  According to Relators, defendant Mesquias, owner and CEO of Merida, relayed his marketing directives and exerted pressure on representatives through Omar Garza, a top-level Merida administrator and Mesquias's "go-between," who supervised Merida's marketers.  Indeed, defendant Mesquias even bribed patients, personally.  For example, Illumina provided J.P. ("J.P.") an electric scooter in exchange for electing to become an Illumina hospice patient.  According to Relator 1, defendant Mesquias personally purchased the scooter from a pawn shop.  Further, J.P.'s wife works for Merida as a personal care assistant.

53.     As a result of Defendants' conduct, claims for government health care beneficiaries, who received these bribes, were submitted to and paid by government health care programs.  Therefore, the Defendants violated the False Claims Act by submitting and receiving payments for claims tainted by violations of the Anti-Kickback Statute.

### 3.     **Fraudulent Use of Generic Diagnoses**

54.    Fundamentally, independent of whatever diagnosis is assessed to a hospice patient, that patient must be certified as terminally ill.  Defendants frequently fabricated Illumina patient diagnoses on claims documents, using generic, vague conditions in order to qualify them for hospice care and Illumina for reimbursement.  For example, Illumina frequently uses liver cirrhosis as a diagnosis and will do so as long as a patient demonstrates any Hyperammonemia, or elevated levels of ammonia in the blood.  Specific examples of patients who were fraudulently admitted to hospice care at Illumina using the fabricated diagnosis of liver cirrhosis include Illumina patients L.P., E.O. and M.B. ("M.B.").  Patient M.B. is on hospice care for her liver cirrhosis in spite of the fact that she is widely believed to be selling her medication, according to Relators.

55.    Defendants also use Alzheimer's disease as a fabricated diagnosis to get patients qualified for hospice care at Illumina.  Specific examples of patients who were fraudulently admitted to hospice care at Illumina using the fabricated diagnoses of Alzheimer's disease include M.V. and I.S. -- both long term patients, neither on any medication besides aspirin.

56.    Alzheimer's disease became a common diagnosis at Illumina around October 2014.  This was no coincidence.  On October 1, 2014, CMS implemented a payment system change that listed "adult failure to thrive" and "dementia" as non-reimbursable conditions as principal hospice diagnoses.  Notably CMS stated:

> A non-specific, ill-defined symptom diagnosis such as "debility" and "adult failure to thrive" is more of a catch-all diagnosis in that a wide variety of principal and/or comorbid conditions contribute to these syndromes. Given the complexity of a hospice patient, with multiple conditions often contributing to the terminal prognosis, we are stating that all diagnoses contributing to (that is, related to) the terminal prognosis of the individual are to be reported on the hospice claims in order to account for the individual needs of each and every Medicare hospice beneficiary.

\*    \*    \*

In the proposed rule we discussed the use of hospice claims-reported principal hospice diagnoses that fall under the ICD-9-CM classification, "Mental, Behavioral and Neurodevelopmental Disorders." There are several codes that fall under this classification that encompass multiple dementia diagnoses that are frequently reported principal hospice diagnoses on hospice claims, but are not appropriate principal diagnoses per *ICD-9-CM Coding Guidelines*. There are, however, other ICD-9-CM dementia codes, such as those for Alzheimer's disease and others, that fall under the ICD-9-CM classification, "Diseases of the Nervous System and Sense Organs" which are acceptable as principal diagnoses per ICD-9-CM coding guidelines.

78 Fed. Reg. 48248, 48252-53 (August 7, 2013).

57.     According to Relator 1, prior to October 2014, failure to thrive and dementia were common diagnoses at Illumina.   It is no coincidence that, simultaneous with CMS's pronouncement that dementia and adult failure to thrive were no longer acceptable diagnoses but Alzheimer's was, Defendants stopped using these diagnoses and instead started using the Alzheimer's disease diagnoses to qualify ineligible patients for hospice care.  In fact, during this time, Illumina staff were instructed to obtain different diagnoses, which Medicare would reimburse for, from providers.  One example of Defendants' fraudulent conduct in this regard involves patient J.G. ("J.G."), a twelve episode Illumina patient.  J.G.'s diagnosis was originally failure-to-thrive, which Illumina then changed to dementia, and then to Alzheimer's, during this time, as a result of the CMS reimbursement policy changes and the lead-up thereto.  Indeed, as demonstrated by Defendants' conduct, the change of diagnoses at Illumina is nothing other than an attempt to continue defrauding government health care programs after the fraudulent diagnoses it previously used were no longer acceptable to CMS.

### 4.     Fabrication of Documents

58.     In addition to fabricating patient diagnoses, Defendants also regularly altered and fabricated documents to create the appearance that requisite face-to-face encounters with patients were performed within the proper time frame.  In order for government health care beneficiaries

to be eligible for the hospice benefit, a physician or nurse practitioner ("NP") must certify that a patient is terminally ill.

59.     In situations where the patient requires at least three benefit periods, a hospice physician or NP must conduct a face-to-face visit with the patient within 30 calendar days prior to the start of the third benefit period and each subsequent recertification. If the required face-to-face encounter does not occur within the time period prescribed by federal regulations, the beneficiary is no longer considered to be certified as terminally ill, and, therefore, is not eligible for the Medicare hospice benefit.   In such instances, the providing hospice is not eligible to receive payment from Medicare and must discharge the patient because he or she is no longer considered terminally ill under Medicare regulations.

60.     Defendants falsified and continue to falsify documents for patients receiving hospice care at Illumina.  Specifically, Defendants backdate existing dates in Illumina patients' charts and "guess" when dates are left blank.  According to Relator 1, Defendants instructed Illumina nurses to "guess" the date based upon the patients date of admission.

61.     As Admissions Coordinator, Relator 2 was responsible for researching referral patients' Medicare benefits prior to admitting them for care.  On or about September 18, 2014, patient M.B. presented for services.  Relator 2 performed the proper pre-admission utilization review and determined that M.B. had received benefit periods of services from another agency previously, and, thus, would need to have a face-to-face encounter with Illumina's physician or hospice nurse practitioner prior to beginning care (*i.e.* third and subsequent benefit periods). *See* Medicare Policy Manual Chapter 9 § 20.1, Timing and Content of Certification; 42 C.F.R. §§ 418.22.

62.     During the September 19, 2014 daily staff meeting, Illumina Director of Nursing

Hudson directed Relator 2 to schedule M.B.'s admission.  In response, Relator 2 reminded Hudson that Medicare regulations require M.B. be seen face-to-face prior to the start of care.  Hudson became very loud, visibly angry and aggressive and stated "we will admit the patient and [medical director] Dr. Pollard will see her when she is scheduled to make visits again" (which, according to Relator 2, was not for another seven days).   Hudson and Intake Coordinator, Martinez, subsequently submitted M.B.'s admission as an "exceptional circumstance" admission, despite the fact M.B. diagnosis did not meet Medicare's exceptional circumstance admission requirements. Relator 1 objected to this practice on multiple occasions during weekly Interdisciplinary Team Meetings, to which Martinez would respond "don't worry about it" and "it's not your job responsibility."

63.      Another example of Defendants' document fabrication occurred in August 2014 when Illumina thought an investigator was coming to its office.  In attempt to cover up its fraudulent practices, Defendants instructed Illumina employees to pull hundreds of patient charts and fill in missing documentation.  Relator 2 witnessed nurses being made to write up physician narratives and other documents that were then provided to the appropriate member of the patients' interdisciplinary group for signature along with the date he or she was to use in the documents. Illumina staff were also forced to "fix" the charts of just about every patient who received hospice care that summer, as Illumina was without a social worker (and thus his or her notes) during June and most of July 2014.  In addition, Illumina also went without a chaplain from around October 3, 2014 until December 11, 2014.   During the aforementioned periods, Defendants violated Medicare's conditions of participation for hospice providers by failing to provide Illumina's patients with Medicare required social services and spiritual care.  *See* 42 C.F.R. § 418.64 (Condition of participation: Core services).

64.     Indeed, Illumina's disregard for Medicare regulations spilled over to other aspects of patient care.  For example, a durable medical equipment ("DME") company contacted Illumina with questions concerning a patient's respiratory diagnosis in an effort to obtain the information necessary to process its claim for the provision of DME.  Upon reviewing the patient's file, Relator 2 determined that the patient had yet to be seen by a physician.  Relator 2 relayed this information to the DME company representative, who then informed Relator 2 that the DME company would not be able to process the supply order until the physician had seen the patient.  When Relator 2 relayed this response to Director of Nursing Hudson, she very aggressively said "why would you tell them Dr. Pollard had not seen the patient?" and then called Intake Coordinator Martinez, stating "now the patient is not going to have her supplies and it is going to cost the company extra to get them."

## COUNT I
### (False Claims Act 31 U.S.C. § 3729(a))

65.     Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

66.     As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to government health care programs by: (1) using fabricated and ineligible generic diagnoses to recertify patients for hospice care; (2) enrolling and recertifying patients who do not meet the requirements for hospice care; (3) falsifying documents to support the admission, certification, and recertification of its patients; and (4) paying kickbacks to patients to sign up to receive Illumina's hospice services.

67.     By virtue of the acts described above, Defendants have violated: (i) 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or (ii) 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or

causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or (iii) 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

68.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relators reallege that Defendants knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment, by engaging in the above-described conduct.

69.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## JURY TRIAL DEMANDED

70.     Relators demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(a)     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, provides;

(b)     that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c)     that attorneys' fees, costs, and expenses that the Relators necessarily incurred in bringing and pressing this case be awarded;

(d)     that the Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e)     that this Court order such other and further relief as it deems proper.

DATED:  May 8, 2015                    Respectfully submitted,

**KENDALL LAW GROUP, LLP**

*Joe Kendall*

_____

Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jody Rudman
Texas Bar No. 00797356
JRUDMAN@KENDALLLAWGROUP.COM
Jamie J. McKey
Texas Bar No. 24045262
JMCKEY@KENDALLLAWGROUP.COM
3232 McKinney Avenue, Suite 700
Dallas, Texas  75204
Telephone:  (214) 744-3000
Facsimile:  (214) 744-3015

**THE WEISER LAW FIRM, P.C.**
Christopher L. Nelson
cln@weiserlawfirm.com
James M. Ficaro
jmf@weiserlawfirm.com
Ross M. Wolfe
rmw@weiserlawfirm.com
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062

*Attorneys for Relators*

JS 44-TXND (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA, ex. rel. JANE DOE and JANE ROE

**DEFENDANTS**
MERIDA HEALTH CARE GROUP, ILLUMINA, LLC, and RODNEY MESQUIAS

(b) County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **Nueces**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Joe Kendall, Jody Rudman, Jaime McKey, Kendall Law Group LLC, 3232 McKinney Ave., Suite 700, Dallas, TX 75204; 214/744-3000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
        Plaintiff

☐ 3  Federal Question
        *(U.S. Government Not a Party)*

☐ 2  U.S. Government
        Defendant

☐ 4  Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
        Proceeding

☐ 2 Removed from
        State Court

☐ 3 Remanded from
        Appellate Court

☐ 4 Reinstated or
        Reopened

☐ 5 Transferred from
        Another District
        *(specify)*

☐ 6 Multidistrict
        Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C.§ 3730
Brief description of cause:
Violation of the False Claims Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED PENDING OR CLOSED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
05/08/2015

SIGNATURE OF ATTORNEY OF RECORD
*Joe Kendall*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____