AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
Holding Session in Brownsville

**ENTERED**
December 30, 2020
David J. Bradley, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| **RODNEY MESQUIAS** | **CASE NUMBER: 1:18CR00008-S1-001** |
| | **USM NUMBER: 99600-380** |
| | Hector Canales |
| | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☒ was found guilty on count(s) _1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, 11s, and 12s on November 6, 2019_
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud | 01/10/2018 | 1s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 2s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 3s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 4s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 5s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 6s |

☒ See Additional Counts of Conviction.

    The defendant is sentenced as provided in pages 2 through _7_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

December 16, 2020
Date of Imposition of Judgment

Signature of Judge

**ROLANDO OLVERA**
**UNITED STATES DISTRICT JUDGE**
Name and Title of Judge

December 30, 2020
Date



GOVERNMENT
EXHIBIT
1
PENGAD 800-631-6989

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

Judgment — Page   __2__   of   __7__

DEFENDANT: **RODNEY MESQUIAS**
CASE NUMBER: **1:18CR00008-S1-001**

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 7s |
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering | 01/10/2018 | 8s |
| 18 U.S.C. § 1512(k) | Conspiracy to Obstruct Justice | 01/10/2018 | 11s |
| 18 U.S.C. § 371 | Conspiracy to Pay and Receive Kickbacks | 01/10/2018 | 12s |

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
                         Sheet 2 – Imprisonment

| | |
|---|---|
| DEFENDANT: | **RODNEY MESQUIAS** |
| CASE NUMBER: | **1:18CR00008-S1-001** |

Judgment — Page ___3___ of ___7___

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: 240 months.

This term consists of 120 months as to each of Counts 1s through 7s, 240 months as to each of Counts 8s and 11s, and 60 months as to Count 12, to be served concurrently, for a total of 240 months.

☐  See Additional Imprisonment Terms.

☒  The court makes the following recommendations to the Bureau of Prisons:
    Designation to a minimum-security facility/camp in the state of Texas.

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ on _____

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3 – Supervised Release

Judgment — Page    4    of    7

DEFENDANT: **RODNEY MESQUIAS**
CASE NUMBER: **1:18CR00008-S1-001**

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: 3 years.
This term consists of 3 years as to each of Counts 1s through 7s and 11s, and 1 year as to Count 12s, to be served concurrently, for a total of 3 years.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

☒ See Special Conditions of Supervision.

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.
14. If restitution is ordered, the defendant must make restitution as ordered by the Judge and in accordance with the applicable provisions of 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663A and/or 3664. The defendant must also pay the assessment imposed in accordance with 18 U.S.C. § 3013.
15. The defendant must notify the U.S. Probation Office of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments.

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
                         Sheet 3D – Supervised Release

Judgment — Page    5    of    7

DEFENDANT:     **RODNEY MESQUIAS**
CASE NUMBER:     **1:18CR00008-S1-001**

# SPECIAL CONDITIONS OF SUPERVISION

You must not communicate, or otherwise interact, with the co-defendants and/or co-conspirators in this case.

You are excluded from participating as a provider in Medicare, Medicaid, and all federal health care programs.

You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer.

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
                         Sheet 5 – Criminal Monetary Penalties

Judgment — Page ___6___ of ___7___

DEFENDANT:      **RODNEY MESQUIAS**
CASE NUMBER:    **1:18CR00008-S1-001**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment**[1] | **JVTA Assessment**[2] |
|---|---|---|---|---|---|
| **TOTALS** | *$1,000.00 | $120,000,000.00 | $0.00 | $0.00 | $0.00 |

*A $100.00 special assessment is ordered as to each of Counts 1s through 8s, 11s, and 12s, for a total of $1,000.00.

☒  See Additional Terms for Criminal Monetary Penalties.

☐  The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**[3] | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Medicare | | $120,000,000.00 | |
| | | | |
| ☐   See Additional Restitution Payees. | | | |
| **TOTALS** | | $120,000,000.00 | |

☐  Restitution amount ordered pursuant to plea agreement $_____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for the  ☐ fine  ☐ restitution.

☐   the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

☐  Based on the Government's motion, the Court finds that reasonable efforts to collect the special assessment are not likely to be effective. Therefore, the assessment is hereby remitted.

[1]  Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
[2]  Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
[3]  Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT: **RODNEY MESQUIAS**
CASE NUMBER: **1:18CR00008-S1-001**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☒ Lump sum payment of $120,001,000.00_____ due immediately, balance due

    ☐ not later than _____, or

    ☒ in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ installments of $_____ over a period of _____,
    to commence _____ after the date of this judgment; or

D ☐ Payment in equal _____ installments of $_____ over a period of _____,
    to commence _____ after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ after release from imprisonment.
    The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties:

    Payable to:    Clerk, U.S. District Court
                 Attn: Finance
                 600 E. Harrison Street #101
                 Brownsville, TX 78520-7114

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

**Case Number**
**Defendant and Co-Defendant Names**                            **Joint and Several**            **Corresponding Payee,**
**(including defendant number)**      **Total Amount**         **Amount**                **if appropriate**

☐ See Additional Defendants and Co-Defendants Held Joint and Several.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:
$3,243,336.00 in United States currency and a personal money judgment in the same amount.

    Further, the Court orders the interlocutory sale for the real property located at 19318 Boca Del Mar, in San Antonio, Texas, and the net proceeds of the sale be held by the United States Marshals Service through the defendant's sentencing and any appeal.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
            Sheet 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
Holding Session in Brownsville

**ENTERED**
February 26, 2021
Nathan Ochsner, Clerk

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| v. | |
| **HENRY MCINNIS** | **CASE NUMBER: 1:18CR00008-S1-002** |
| | **USM NUMBER: 70592-079** |

Edmund K. Cyganiewicz
_____
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

☒ was found guilty on count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, and 11s on November 6, 2019
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud | 01/10/2018 | 1s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 2s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 3s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 4s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 5s |
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 6s |

☒ See Additional Counts of Conviction.

     The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

February 3, 2021
_____
Date of Imposition of Judgment

_____
Signature of Judge

**ROLANDO OLVERA**
**UNITED STATES DISTRICT JUDGE**
Name and Title of Judge

February 26, 2021
_____
Date

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

| | Judgment — Page | 2 | of | 7 |

DEFENDANT:        **HENRY MCINNIS**
CASE NUMBER:    **1:18CR00008-S1-002**

# ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud | 01/10/2018 | 7s |
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering | 01/10/2018 | 8s |
| 18 U.S.C. § 1512(k) | Conspiracy to Obstruct Justice | 01/10/2018 | 11s |

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 2 – Imprisonment

DEFENDANT:      **HENRY MCINNIS**                     Judgment — Page ___3___ of ___7___
CASE NUMBER:    **1:18CR00008-S1-002**

# IMPRISONMENT

        The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: <u>180 months.</u>

This term consists of 120 months as to each of Counts 1s, 2s, 3s, 4s, 5s, 6s, and 7s, and 180 months as to each of Counts 8s and 11s, to run concurrently, for a total of 180 months.

The Court further recommends the defendant be given credit for time served.

☐  See Additional Imprisonment Terms.

☒  The court makes the following recommendations to the Bureau of Prisons:
    The defendant be designated to a facility near Bastrop, Texas.
    The defendant participate in the 500-hour Residential Drug Abuse Program (RDAP).

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:
    ☐  at _____ on _____
    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
    ☐  before 2 p.m. on _____
    ☐  as notified by the United States Marshal.
    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

  I have executed this judgment as follows:

_____

_____

_____

  Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

                                                _____
                                                UNITED STATES MARSHAL

                                        By _____
                                              DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment — Page | 4 | of | 7 |

DEFENDANT: **HENRY MCINNIS**
CASE NUMBER: **1:18CR00008-S1-002**

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: <u>3 years.</u>
This term consists of 3 years as to each of Counts 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, and 11s, to be served concurrently, for a total of 3 years.

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

☒ See Special Conditions of Supervision.

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.
14. If restitution is ordered, the defendant must make restitution as ordered by the Judge and in accordance with the applicable provisions of 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663A and/or 3664. The defendant must also pay the assessment imposed in accordance with 18 U.S.C. § 3013.
15. The defendant must notify the U.S. Probation Office of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D – Supervised Release

Judgment — Page    5    of    7

DEFENDANT:    **HENRY MCINNIS**
CASE NUMBER:    **1:18CR00008-S1-002**

# SPECIAL CONDITIONS OF SUPERVISION

You must not communicate, or otherwise interact, with the co-defendants and/or co-conspirators in this case.

You must provide the probation officer with access to any requested financial information and authorize the release of any financial information.  The probation office may share financial information with the U.S. Attorney's Office.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer.

AO 245B (Rev. 09/19)      Judgment in a Criminal Case
                         Sheet 5 – Criminal Monetary Penalties

Judgment — Page ___6___ of ___7___

DEFENDANT:      **HENRY MCINNIS**
CASE NUMBER:    **1:18CR00008-S1-002**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment[1] | JVTA Assessment[2] |
|---|---|---|---|---|---|
| **TOTALS** | *$900.00 | $0.00 | $0.00 | $0.00 | $0.00 |

   *A $100.00 special assessment is ordered as to each of Counts 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, and 11s, for a total of $900.00.

☒   See Additional Terms for Criminal Monetary Penalties.

☐   The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

**Name of Payee**                                   **Total Loss[3]**    **Restitution Ordered**    **Priority or Percentage**


☐   See Additional Restitution Payees.
**TOTALS**

☐   Restitution amount ordered pursuant to plea agreement $_____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

      ☐   the interest requirement is waived for the   ☐ fine   ☐ restitution.

      ☐   the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

☐   Based on the Government's motion, the Court finds that reasonable efforts to collect the special assessment are not likely to be effective. Therefore, the assessment is hereby remitted.

[1]   Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
[2]   Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
[3]   Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

Judgment — Page 7 of 7

DEFENDANT: **HENRY MCINNIS**
CASE NUMBER: **1:18CR00008-S1-002**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☒ Lump sum payment of $900.00 due immediately, balance due

    ☐ not later than _____, or
    ☒ in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ installments of $_____ over a period of _____,
    to commence _____ after the date of this judgment; or

D ☐ Payment in equal _____ installments of $_____ over a period of _____,
    to commence _____ after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties:

    Payable to:   Clerk, U.S. District Court
                Attn: Finance
                600 E. Harrison Street #101
                Brownsville, Texas 78520-7114

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

**Case Number**
**Defendant and Co-Defendant Names**
**(including defendant number)**     **Total Amount**     **Joint and Several Amount**     **Corresponding Payee, if appropriate**

☐ See Additional Defendants and Co-Defendants Held Joint and Several.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States: $197,088.00 in United States currency and a personal money judgment in the same amount.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# United States Court of Appeals
## for the Fifth Circuit

United States Courts
Southern District of Texas
FILED

*April 18, 2022*

Nathan Ochsner, Clerk of Court

No. 20-40869

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2022

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

RODNEY MESQUIAS,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CR-8-1

Before JONES, HAYNES, and COSTA, *Circuit Judges.*

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

Certified as a true copy and issued
as the mandate on **Apr 18, 2022**

**Attest:** *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

April 18, 2022

Mr. Nathan Ochsner
Southern District of Texas, Brownsville
United States District Court
600 E. Harrison Street
Room 1158
Brownsville, TX 78520

      No. 20-40869   USA v. Mesquias
                    USDC No. 1:18-CR-8-1

                    USA V. McInnis
                    USDC No. 1:18-CR-8-2

Dear Mr. Ochsner,

Enclosed is a copy of the judgments issued as the mandates and a
copy of the court's opinion.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    *Christina Gardner*

                    By: _____
                    Christina A. Gardner, Deputy Clerk
                    504-310-7684

cc: (letter only)
      Mr. Hector Antonio Canales
      Mr. Jose Antonio Canales
      Mr. Robert Louis Guerra Jr.
      Mr. Joshua K. Handell
      Mr. Cooke Kelsey
      Ms. Carmen Castillo Mitchell
      Mr. Jeremy Raymond Sanders

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 24, 2022

Lyle W. Cayce
Clerk

No. 20-40869

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

RODNEY MESQUIAS; HENRY MCINNIS,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CR-8-1

Before JONES, HAYNES, and COSTA, *Circuit Judges.*
GREGG COSTA, *Circuit Judge:*

For close to a decade, Rodney Mesquias and Henry McInnis ran a
network of home health and hospice centers in Texas. A federal grand jury
alleged that Mesquias and McInnis, along with others not parties to this
appeal, engaged in a scheme to falsely certify that patients were eligible for
home health or hospice services. The indictment charged them with six
counts of health care fraud and one count each of conspiracy to commit
health care fraud, conspiracy to launder money, and conspiracy to obstruct
justice. Mesquias faced an additional charge—conspiracy to pay kickbacks.
After a twelve-day trial, a jury convicted Mesquias and McInnis on all counts.

No. 20-40869

The district court sentenced them to prison terms of twenty and fifteen years respectively. We consider whether: (1) sufficient evidence supports the fraud convictions and (2) the district court properly calculated loss when sentencing defendants.

I

Defendants challenge the sufficiency of the evidence to support their convictions for health care fraud and conspiracy to commit that fraud.[1] Our sufficiency review is highly deferential to the jury's verdict. We will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt. *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016). As a result, the recounting of the evidence that follows is in the light most favorable to the jury's verdict. *United States v. Moreno-Gonzales*, 662 F.3d 369, 372 (5th Cir. 2011).

A

Medicare, the multibillion dollar federal health care program, reimburses certain home health and hospice treatments. Home health care includes nursing and therapy for patients who, owing to their medical problems, find it difficult to leave their home without assistance. Hospice is holistic end-of-life care for patients who are dying. It is palliative—focused on making the patient comfortable in their dying days—rather than curative.

A web of statutes and regulations governs whether Medicare will pay for these services. Medicare covers home health services when a doctor

---

[1] Defendants' opening briefs challenge only the substantive health care fraud convictions. McInnis's reply brief belatedly tries to challenge the convictions for conspiracy to commit health care fraud, arguing that they are "predicated on the same purported fraud" as the substantive fraud counts. Even if we were to consider McInnis's argument, however, the evidence supporting the substantive counts would be more than sufficient to support the conspiracy counts.

No. 20-40869

certifies that the patient is confined at home and needs skilled nursing or therapy. 42 U.S.C. § 1395f(a)(2)(C). Hospice care is reimbursed when both the patient's primary-care physician and the medical director of the hospice certify that the patient has a life expectancy of six months or less. *Id.* §§ 1395f(a)(7), 1395x(dd)(3)(A). The hospice certification lasts ninety days, *id.* § 1395f(a)(7), but Medicare acknowledges that estimating life expectancy is an inexact science and allows for periodic renewal of hospice lasting beyond six months upon recertification by either the primary-care physician or medical director. *See id.*; 79 Fed. Reg. 50452, 50470 (Aug. 22, 2014).

Given the millions of claims that it handles, Medicare cannot scrutinize every claim that comes through the door. So the front end of its reimbursement system is based on trust. If a provider submits a claim with all the information Medicare asks for—including the required certifications—Medicare pays the claim without verifying the accuracy of the underlying information. On the back end, after Medicare reimburses the providers, auditors review suspicious claims.

B

A person commits health care fraud by "knowingly and willfully execut[ing] a scheme to defraud a government health care program like Medicare." *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017) (citing 18 U.S.C. § 1347). A person is guilty of conspiring to commit health care fraud when he knowingly agrees to execute the fraud scheme with the intent to further its unlawful purpose. *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013) (citing 18 U.S.C. § 1349).

Overwhelming evidence established that Mesquias and McInnis committed health care fraud by abusing Medicare's reimburse-first-verify-later system from 2009 to 2018. That evidence, sampled below, is more than sufficient to support the guilty verdicts.

No. 20-40869

Through their respective positions as owner-president and CEO of the Merida Group—the umbrella company for several businesses purportedly offering home health and hospice care—Mesquias and McInnis orchestrated a scheme of certifying patients for home health and hospice care regardless of their eligibility. They certified all patients who came to their facilities, regardless of eligibility. After the patients were certified once, defendants recertified them indefinitely, again without consideration of their eligibility. An estimated 70 to 85 percent of the Merida Group's patients were ineligible for the care they received.

A few examples show that many certifications were not borderline cases. One hospice patient had a regular job at Walmart, even though having employment disqualifies patients from hospice. Another, who supposedly had terminal-level dementia, recounted to his nurse a days-old memory of twisting his knee while dancing the Macarena at a family celebration. And one home health patient was actually a boxing instructor at a local gym; he was spotted drinking a beer while driving when he was supposed to be stuck at home with a disability.

To facilitate the fraudulent certification, Mesquias and McInnis built a roster of compliant in-house medical directors at Merida Group. The medical directors routinely lied about having seen patients face-to-face as Medicare requires, exaggerated how sick the patients were and made up diagnoses so that the patients would appear eligible for hospice, and fabricated medical records to cover their tracks. The directors also circumvented the patients' primary-care physicians and often referred patients to hospice at one of the Merida Group's entities over the objections of those physicians.

The carrot-and-stick approach defendants used to control the actors in their scheme reveals their fraudulent intent. The carrots were financial

incentives like raises and bonuses to participate in the fraud. The sticks were harsh. Defendants intimidated their employees into submission. When employees pushed back against his excesses, Mesquias warned them not to "f*** with his money." McInnis was the enforcer. He "cuss[ed] out" skeptical nurses and "yell[ed] at the staff" if patients were not certified. For those who failed to go along, consequences were severe. One medical director lost his job for refusing to refer patients to hospice. Other employees, like nurses, who raised questions were also fired or threatened with termination.

Taxpayers were not the only victims of defendants' scheme; patients suffered too. Defendants lied to patients and families about the eligibility requirements for home health and hospice care and roped them in by exaggerating potential benefits. They targeted poor and elderly non-English speakers in San Antonio housing projects and used the language barrier to trick them into signing up for hospice care. Defendants also told patients that they had terminal illnesses when they did not. Those lies took a psychological toll. To take an example, one patient who was told that she had less than six months to live began thinking about ending her life so that her family would not have to watch her die slowly. She lost her appetite, cried incessantly, confined herself at home because she did not want to burden her family, and stopped sleeping out of the fear that she would never wake up. Five years after the diagnosis telling her that she had six months to live, that patient testified at trial.

The scale of the scheme matched its cruelty. By the time they were caught, defendants had submitted over 47,000 claims for over 9000 patients. They billed over $152 million to Medicare and received $124 million.

To prove this fraud at trial, the government called nineteen witnesses—fourteen of whom were involved with Merida Group and three

No. 20-40869

of whom were also charged in the conspiracy[2]—who established the facts just
discussed. This evidence, which is only a sampling, is more than enough to
show an overall conspiracy and scheme to engage in health care fraud.
Indeed, it is more damning evidence than that in other cases in which we have
upheld health care fraud convictions. *See, e.g.*, *United States v. Veasey*, 843 F.
App'x 555, 561–65 (5th Cir. 2021); *United States v. Ezukanma*, 756 F. App'x
360, 364–69 (5th Cir. 2018); *Sanjar*, 876 F.3d at 746; *United States v. Barson*,
845 F.3d 159, 163–65 (5th Cir. 2016); *United States v. Willett*, 751 F.3d 335,
340–43 (5th Cir. 2014).

C

Defendants do not address most of this evidence. Instead, they
advance two arguments in the effort to overturn their convictions. First, they
assert that the government offered no proof that they knew the patients were
ineligible for home health and hospice. Mesquias argues that he could not
have had the requisite intent to defraud because the government offered no
evidence that he played a role in the false certifications. McInnis separately
portrays himself as an innocent office worker with no power to question the
certifications.

The evidence belies their claims of ignorance. Mesquias was the
driving force behind the false certifications and doctored medical records.
He established the rule of admitting every patient and not discharging them.
He ordered that medical directors spend multiple days creating "boxes" of
falsified medical records. McInnis enforced Mesquias's rules. He ran the
day-to-day operations of the organization from its "nerve center" in

---

[2] The government charged four others: an administrator named Jose Garza and
three medical directors, Jesus Virlar, Eduardo Carrillo, and Francisco Pena. Garza, Virlar,
and Carillo pleaded guilty and testified at trial. Pena faced trial with Mesquias and McInnis
and was convicted on all counts but died before sentencing.

6

Harlingen, issuing directives on how to circumvent objecting physicians, falsify medical records, dupe auditors, and lie to patients. And he aggressively confronted employees who questioned the scheme. Unlike cases in which we have found insufficient evidence to support health care fraud convictions, *see United States v. Nora*, 988 F.3d 823, 833–34 (5th Cir. 2021) (reversing an officer manager's conviction because he did not know that his work was unlawful); *United States v. Ganji*, 880 F.3d 760, 773–78 (5th Cir. 2018) (reversing doctors' convictions because the government offered no proof that they were involved in the fraud scheme), Mesquias and McInnis were intimately involved with the fraud. *See Sanjar*, 876 F.3d at 746 (affirming the convictions of two doctors who orchestrated a fraud scheme).

Second, defendants argue that the government did not prove the ineligibility of the six patients whose claims were listed as the substantive fraud counts. Again, the record tells a different story. Merida Group medical directors testified that the certifications for all six patients were either outright lies or based on fabricated medical records. Such testimony of a co-conspirator, as long as it is not incredible, is alone sufficient to support a conviction. *United States v. McClaren*, 13 F.4th 386, 399 (5th Cir. 2021) (explaining that such testimony is incredible only if it defies the laws of nature or involves matters the witness could not have observed). Although corroboration of these damaging admissions was not required for the jury to convict, ample circumstantial evidence backed up the co-conspirators' testimony. The named patients were in hospice for an average of three years, a far cry from Medicare's six-months-to-live eligibility requirement.[3] Some

---

[3] As we have noted, Medicare allows for recertification beyond six months because medical predictions are not always accurate. Still, the length of the lives at issue support the co-conspirators' testimony.

patients were alive when they were discharged; one even testified at trial five years after being certified.

Defendants also point us to a pair of cases—one from a different circuit, one from a district court, both involving the civil False Claims Act—declining to find that certain claims submitted to Medicare were fraudulent. *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1285 (11th Cir. 2019); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *19 (N.D. Tex. June 20, 2016). But in those cases, there was no evidence of fraud beyond (1) after-the-fact expert testimony that the initial determinations of hospice eligibility were inaccurate, and (2) unrelated anecdotes of lax business practices. *AseraCare*, 938 F.3d at 1285; *Wall*, 2016 WL 3449833, at *19. Both cases recognized that stronger evidence, like facts inconsistent with doctors' proper exercise of their clinical judgment, could change the outcome. *See AseraCare*, 938 F.3d at 1297; *Wall*, 2016 WL 3449833, at *17. That stronger evidence—of lies, kickbacks, and fabrication—is present here.

From *AseraCare* and *Wall*, defendants derive an "objective falsity" theory. Under this theory, clinical judgments, like the ones underlying hospice and home health certifications, cannot be the basis of a fraud prosecution unless the government offers expert testimony to prove them objectively false. But health care providers cannot immunize themselves from prosecution by cloaking fraud with a doctor's note. *See United States v. Veasey*, 843 F. App'x 555, 561–62 (5th Cir. 2021) (rejecting the argument that a factual determination that a patient is "homebound" is a medical opinion that cannot establish intent to commit fraud). Categorical evidentiary requirements are at odds with a jury's ability to consider a broad array of direct and circumstantial evidence. *See Sanjar*, 876 F.3d at 745 (rejecting a categorical rule requiring expert testimony in health care fraud cases); *see also* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL) 1.07 (2015) ("The law makes no distinction between the weight to be given either

No. 20-40869

direct or circumstantial evidence."). What is more compelling: a doctor's testimony that he lied when certifying a patient or an expert's testimony that he would have made a different clinical determination than the certifying doctor? Common sense suggests the former, which is in abundance here.

Defendants' arguments do not show that the jury lacked evidence to find them guilty. We therefore affirm their convictions.

II

That brings us to sentencing. The district court found that defendants' fraud was pervasive and thus treated the entire amount that they billed to Medicare as the intended loss. That enhanced their offense levels by 24 points, resulting in an advisory Sentencing Guidelines range of life in prison. U.S.S.G. § 2B1.1. The district court then sentenced Mesquias to 240 months and McInnis to 180 months.

Before imposing those sentences, the district court rejected the defense's request for testimony at the sentencing hearing. We are troubled by that refusal. The momentousness of any sentencing, combined with the complexity of this $100 million-plus fraud scheme, would seem to have warranted allowing testimony absent some compelling reason to the contrary. But defendants' briefs do not raise the denial of testimony as reason to remand or vacate their convictions. Nor did defendants specify in district court the testimony that they planned to elicit.

We thus turn to the argument that defendants do raise: that the court erred in calculating loss. In defendants' view, because the government did not prove that the fraud was pervasive, the district court should have limited the intended loss to the roughly $20,000 billed for the six patients associated with the substantive health care fraud counts.

9

No. 20-40869

The government ordinarily has the burden to prove loss at sentencing. *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012). But when fraud is pervasive—that is, when it becomes impractical to separate legitimate claims from fraudulent ones—the burden shifts to the defendant to show legitimate instances of billing. *Id.* If a district court finds pervasive fraud, it can then use the entire amount billed to Medicare as intended loss. *See United States v. Barnes*, 979 F.3d 283, 309, 312 (5th Cir. 2020). That crucial finding of pervasive fraud is reviewed for clear error. *Id.* at 312.

The same evidence that supported defendants' convictions also allowed the district court to find that the fraud was pervasive. Defendants' fraud seeped through every nook of their operation. According to former Merida Group medical directors, none of the organization's medical records were trustworthy. Nurses echoed the medical directors, testifying that 70 to 85 percent of their patients were ineligible for hospice. Given this comprehensive fraud, the district court was not required to sift through thousands of claims of dubious reliability to sort the fraudulent from the nonfraudulent. We have upheld pervasive fraud findings on less. *See United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) (finding pervasive fraud when defendant provided unnecessary services over six years); *Ezukanma*, 756 F. App'x at 373 (finding pervasive fraud of overbilling in case involving over 90,000 claims); *United States v. Dubor*, 821 F. App'x 327, 329 (5th Cir. 2020) (finding pervasive fraud of kickbacks over five years). And defendants identified no legitimate billings to reduce the loss amount.

\* \* \*

The convictions and sentences are AFFIRMED.

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2022

Lyle W. Cayce
Clerk

No. 20-40869

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

HENRY MCINNIS,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CR-8-2

Before JONES, HAYNES, and COSTA, *Circuit Judges.*

## JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.



Certified as a true copy and issued
as the mandate on **Apr 18, 2022**

Attest: *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# United States Court of Appeals

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

April 18, 2022

Mr. Nathan Ochsner
Southern District of Texas, Brownsville
United States District Court
600 E. Harrison Street
Room 1158
Brownsville, TX 78520

     No. 20-40869    USA v. Mesquias
                         USDC No. 1:18-CR-8-1

                         USA V. McInnis
                         USDC No. 1:18-CR-8-2

Dear Mr. Ochsner,

Enclosed is a copy of the judgments issued as the mandates and a
copy of the court's opinion.

                      Sincerely,

                      LYLE W. CAYCE, Clerk

                      *Christina Gardner*
                      By: _____
                      Christina A. Gardner, Deputy Clerk
                      504-310-7684

cc: (letter only)
      Mr. Hector Antonio Canales
      Mr. Jose Antonio Canales
      Mr. Robert Louis Guerra Jr.
      Mr. Joshua K. Handell
      Mr. Cooke Kelsey
      Ms. Carmen Castillo Mitchell
      Mr. Jeremy Raymond Sanders

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 24, 2022

Lyle W. Cayce
Clerk

No. 20-40869

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

RODNEY MESQUIAS; HENRY MCINNIS,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CR-8-1

Before JONES, HAYNES, and COSTA, *Circuit Judges.*
GREGG COSTA, *Circuit Judge:*

For close to a decade, Rodney Mesquias and Henry McInnis ran a network of home health and hospice centers in Texas. A federal grand jury alleged that Mesquias and McInnis, along with others not parties to this appeal, engaged in a scheme to falsely certify that patients were eligible for home health or hospice services. The indictment charged them with six counts of health care fraud and one count each of conspiracy to commit health care fraud, conspiracy to launder money, and conspiracy to obstruct justice. Mesquias faced an additional charge—conspiracy to pay kickbacks. After a twelve-day trial, a jury convicted Mesquias and McInnis on all counts.

No. 20-40869

The district court sentenced them to prison terms of twenty and fifteen years respectively. We consider whether: (1) sufficient evidence supports the fraud convictions and (2) the district court properly calculated loss when sentencing defendants.

I

Defendants challenge the sufficiency of the evidence to support their convictions for health care fraud and conspiracy to commit that fraud.[1] Our sufficiency review is highly deferential to the jury's verdict. We will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt. *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016). As a result, the recounting of the evidence that follows is in the light most favorable to the jury's verdict. *United States v. Moreno-Gonzales*, 662 F.3d 369, 372 (5th Cir. 2011).

A

Medicare, the multibillion dollar federal health care program, reimburses certain home health and hospice treatments. Home health care includes nursing and therapy for patients who, owing to their medical problems, find it difficult to leave their home without assistance. Hospice is holistic end-of-life care for patients who are dying. It is palliative—focused on making the patient comfortable in their dying days—rather than curative.

A web of statutes and regulations governs whether Medicare will pay for these services. Medicare covers home health services when a doctor

---

[1] Defendants' opening briefs challenge only the substantive health care fraud convictions. McInnis's reply brief belatedly tries to challenge the convictions for conspiracy to commit health care fraud, arguing that they are "predicated on the same purported fraud" as the substantive fraud counts. Even if we were to consider McInnis's argument, however, the evidence supporting the substantive counts would be more than sufficient to support the conspiracy counts.

certifies that the patient is confined at home and needs skilled nursing or therapy. 42 U.S.C. § 1395f(a)(2)(C). Hospice care is reimbursed when both the patient's primary-care physician and the medical director of the hospice certify that the patient has a life expectancy of six months or less. *Id.* §§ 1395f(a)(7), 1395x(dd)(3)(A). The hospice certification lasts ninety days, *id.* § 1395f(a)(7), but Medicare acknowledges that estimating life expectancy is an inexact science and allows for periodic renewal of hospice lasting beyond six months upon recertification by either the primary-care physician or medical director. *See id.*; 79 Fed. Reg. 50452, 50470 (Aug. 22, 2014).

Given the millions of claims that it handles, Medicare cannot scrutinize every claim that comes through the door. So the front end of its reimbursement system is based on trust. If a provider submits a claim with all the information Medicare asks for—including the required certifications—Medicare pays the claim without verifying the accuracy of the underlying information. On the back end, after Medicare reimburses the providers, auditors review suspicious claims.

B

A person commits health care fraud by "knowingly and willfully execut[ing] a scheme to defraud a government health care program like Medicare." *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017) (citing 18 U.S.C. § 1347). A person is guilty of conspiring to commit health care fraud when he knowingly agrees to execute the fraud scheme with the intent to further its unlawful purpose. *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013) (citing 18 U.S.C. § 1349).

Overwhelming evidence established that Mesquias and McInnis committed health care fraud by abusing Medicare's reimburse-first-verify-later system from 2009 to 2018. That evidence, sampled below, is more than sufficient to support the guilty verdicts.

No. 20-40869

Through their respective positions as owner-president and CEO of the Merida Group—the umbrella company for several businesses purportedly offering home health and hospice care—Mesquias and McInnis orchestrated a scheme of certifying patients for home health and hospice care regardless of their eligibility. They certified all patients who came to their facilities, regardless of eligibility. After the patients were certified once, defendants recertified them indefinitely, again without consideration of their eligibility. An estimated 70 to 85 percent of the Merida Group's patients were ineligible for the care they received.

A few examples show that many certifications were not borderline cases. One hospice patient had a regular job at Walmart, even though having employment disqualifies patients from hospice. Another, who supposedly had terminal-level dementia, recounted to his nurse a days-old memory of twisting his knee while dancing the Macarena at a family celebration. And one home health patient was actually a boxing instructor at a local gym; he was spotted drinking a beer while driving when he was supposed to be stuck at home with a disability.

To facilitate the fraudulent certification, Mesquias and McInnis built a roster of compliant in-house medical directors at Merida Group. The medical directors routinely lied about having seen patients face-to-face as Medicare requires, exaggerated how sick the patients were and made up diagnoses so that the patients would appear eligible for hospice, and fabricated medical records to cover their tracks. The directors also circumvented the patients' primary-care physicians and often referred patients to hospice at one of the Merida Group's entities over the objections of those physicians.

The carrot-and-stick approach defendants used to control the actors in their scheme reveals their fraudulent intent. The carrots were financial

No. 20-40869

incentives like raises and bonuses to participate in the fraud. The sticks were harsh. Defendants intimidated their employees into submission. When employees pushed back against his excesses, Mesquias warned them not to "f*** with his money." McInnis was the enforcer. He "cuss[ed] out" skeptical nurses and "yell[ed] at the staff" if patients were not certified. For those who failed to go along, consequences were severe. One medical director lost his job for refusing to refer patients to hospice. Other employees, like nurses, who raised questions were also fired or threatened with termination.

Taxpayers were not the only victims of defendants' scheme; patients suffered too. Defendants lied to patients and families about the eligibility requirements for home health and hospice care and roped them in by exaggerating potential benefits. They targeted poor and elderly non-English speakers in San Antonio housing projects and used the language barrier to trick them into signing up for hospice care. Defendants also told patients that they had terminal illnesses when they did not. Those lies took a psychological toll. To take an example, one patient who was told that she had less than six months to live began thinking about ending her life so that her family would not have to watch her die slowly. She lost her appetite, cried incessantly, confined herself at home because she did not want to burden her family, and stopped sleeping out of the fear that she would never wake up. Five years after the diagnosis telling her that she had six months to live, that patient testified at trial.

The scale of the scheme matched its cruelty. By the time they were caught, defendants had submitted over 47,000 claims for over 9000 patients. They billed over $152 million to Medicare and received $124 million.

To prove this fraud at trial, the government called nineteen witnesses—fourteen of whom were involved with Merida Group and three

of whom were also charged in the conspiracy[2]—who established the facts just discussed. This evidence, which is only a sampling, is more than enough to show an overall conspiracy and scheme to engage in health care fraud. Indeed, it is more damning evidence than that in other cases in which we have upheld health care fraud convictions. *See, e.g., United States v. Veasey*, 843 F. App'x 555, 561–65 (5th Cir. 2021); *United States v. Ezukanma*, 756 F. App'x 360, 364–69 (5th Cir. 2018); *Sanjar*, 876 F.3d at 746; *United States v. Barson*, 845 F.3d 159, 163–65 (5th Cir. 2016); *United States v. Willett*, 751 F.3d 335, 340–43 (5th Cir. 2014).

C

Defendants do not address most of this evidence. Instead, they advance two arguments in the effort to overturn their convictions. First, they assert that the government offered no proof that they knew the patients were ineligible for home health and hospice. Mesquias argues that he could not have had the requisite intent to defraud because the government offered no evidence that he played a role in the false certifications. McInnis separately portrays himself as an innocent office worker with no power to question the certifications.

The evidence belies their claims of ignorance. Mesquias was the driving force behind the false certifications and doctored medical records. He established the rule of admitting every patient and not discharging them. He ordered that medical directors spend multiple days creating "boxes" of falsified medical records. McInnis enforced Mesquias's rules. He ran the day-to-day operations of the organization from its "nerve center" in

---

[2] The government charged four others: an administrator named Jose Garza and three medical directors, Jesus Virlar, Eduardo Carrillo, and Francisco Pena. Garza, Virlar, and Carillo pleaded guilty and testified at trial. Pena faced trial with Mesquias and McInnis and was convicted on all counts but died before sentencing.

Harlingen, issuing directives on how to circumvent objecting physicians, falsify medical records, dupe auditors, and lie to patients. And he aggressively confronted employees who questioned the scheme. Unlike cases in which we have found insufficient evidence to support health care fraud convictions, *see United States v. Nora*, 988 F.3d 823, 833–34 (5th Cir. 2021) (reversing an officer manager's conviction because he did not know that his work was unlawful); *United States v. Ganji*, 880 F.3d 760, 773–78 (5th Cir. 2018) (reversing doctors' convictions because the government offered no proof that they were involved in the fraud scheme), Mesquias and McInnis were intimately involved with the fraud. *See Sanjar*, 876 F.3d at 746 (affirming the convictions of two doctors who orchestrated a fraud scheme).

Second, defendants argue that the government did not prove the ineligibility of the six patients whose claims were listed as the substantive fraud counts. Again, the record tells a different story. Merida Group medical directors testified that the certifications for all six patients were either outright lies or based on fabricated medical records. Such testimony of a co-conspirator, as long as it is not incredible, is alone sufficient to support a conviction. *United States v. McClaren*, 13 F.4th 386, 399 (5th Cir. 2021) (explaining that such testimony is incredible only if it defies the laws of nature or involves matters the witness could not have observed). Although corroboration of these damaging admissions was not required for the jury to convict, ample circumstantial evidence backed up the co-conspirators' testimony. The named patients were in hospice for an average of three years, a far cry from Medicare's six-months-to-live eligibility requirement.[3] Some

---

[3] As we have noted, Medicare allows for recertification beyond six months because medical predictions are not always accurate. Still, the length of the lives at issue support the co-conspirators' testimony.

No. 20-40869

patients were alive when they were discharged; one even testified at trial five years after being certified.

Defendants also point us to a pair of cases—one from a different circuit, one from a district court, both involving the civil False Claims Act—declining to find that certain claims submitted to Medicare were fraudulent. *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1285 (11th Cir. 2019); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *19 (N.D. Tex. June 20, 2016). But in those cases, there was no evidence of fraud beyond (1) after-the-fact expert testimony that the initial determinations of hospice eligibility were inaccurate, and (2) unrelated anecdotes of lax business practices. *AseraCare*, 938 F.3d at 1285; *Wall*, 2016 WL 3449833, at *19. Both cases recognized that stronger evidence, like facts inconsistent with doctors' proper exercise of their clinical judgment, could change the outcome. *See AseraCare*, 938 F.3d at 1297; *Wall*, 2016 WL 3449833, at *17. That stronger evidence—of lies, kickbacks, and fabrication—is present here.

From *AseraCare* and *Wall*, defendants derive an "objective falsity" theory. Under this theory, clinical judgments, like the ones underlying hospice and home health certifications, cannot be the basis of a fraud prosecution unless the government offers expert testimony to prove them objectively false. But health care providers cannot immunize themselves from prosecution by cloaking fraud with a doctor's note. *See United States v. Veasey*, 843 F. App'x 555, 561–62 (5th Cir. 2021) (rejecting the argument that a factual determination that a patient is "homebound" is a medical opinion that cannot establish intent to commit fraud). Categorical evidentiary requirements are at odds with a jury's ability to consider a broad array of direct and circumstantial evidence. *See Sanjar*, 876 F.3d at 745 (rejecting a categorical rule requiring expert testimony in health care fraud cases); *see also* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL) 1.07 (2015) ("The law makes no distinction between the weight to be given either

8

direct or circumstantial evidence."). What is more compelling: a doctor's testimony that he lied when certifying a patient or an expert's testimony that he would have made a different clinical determination than the certifying doctor? Common sense suggests the former, which is in abundance here.

Defendants' arguments do not show that the jury lacked evidence to find them guilty. We therefore affirm their convictions.

## II

That brings us to sentencing. The district court found that defendants' fraud was pervasive and thus treated the entire amount that they billed to Medicare as the intended loss. That enhanced their offense levels by 24 points, resulting in an advisory Sentencing Guidelines range of life in prison. U.S.S.G. § 2B1.1. The district court then sentenced Mesquias to 240 months and McInnis to 180 months.

Before imposing those sentences, the district court rejected the defense's request for testimony at the sentencing hearing. We are troubled by that refusal. The momentousness of any sentencing, combined with the complexity of this $100 million-plus fraud scheme, would seem to have warranted allowing testimony absent some compelling reason to the contrary. But defendants' briefs do not raise the denial of testimony as reason to remand or vacate their convictions. Nor did defendants specify in district court the testimony that they planned to elicit.

We thus turn to the argument that defendants do raise: that the court erred in calculating loss. In defendants' view, because the government did not prove that the fraud was pervasive, the district court should have limited the intended loss to the roughly $20,000 billed for the six patients associated with the substantive health care fraud counts.

No. 20-40869

The government ordinarily has the burden to prove loss at sentencing. *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012). But when fraud is pervasive—that is, when it becomes impractical to separate legitimate claims from fraudulent ones—the burden shifts to the defendant to show legitimate instances of billing. *Id.* If a district court finds pervasive fraud, it can then use the entire amount billed to Medicare as intended loss. *See United States v. Barnes*, 979 F.3d 283, 309, 312 (5th Cir. 2020). That crucial finding of pervasive fraud is reviewed for clear error. *Id.* at 312.

The same evidence that supported defendants' convictions also allowed the district court to find that the fraud was pervasive. Defendants' fraud seeped through every nook of their operation. According to former Merida Group medical directors, none of the organization's medical records were trustworthy. Nurses echoed the medical directors, testifying that 70 to 85 percent of their patients were ineligible for hospice. Given this comprehensive fraud, the district court was not required to sift through thousands of claims of dubious reliability to sort the fraudulent from the nonfraudulent. We have upheld pervasive fraud findings on less. *See United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) (finding pervasive fraud when defendant provided unnecessary services over six years); *Ezukanma*, 756 F. App'x at 373 (finding pervasive fraud of overbilling in case involving over 90,000 claims); *United States v. Dubor*, 821 F. App'x 327, 329 (5th Cir. 2020) (finding pervasive fraud of kickbacks over five years). And defendants identified no legitimate billings to reduce the loss amount.

\* \* \*

The convictions and sentences are AFFIRMED.

10

United States Courts
Southern District of Texas
FILED

*October 04, 2022*

Nathan Ochsner, Clerk of Court

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC 20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

October 3, 2022



Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

  Re: Rodney Mesquias
     v. United States
     No. 22-5168
     (Your No. 20-40869)
     1:18-cr-8-1

Dear Clerk:

    The Court today entered the following order in the above-entitled case:

    The petition for a writ of certiorari is denied.

          Sincerely,

          Scott S. Harris, Clerk

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

October 04, 2022

Mr. Nathan Ochsner
Southern District of Texas, Brownsville
United States District Court
600 E. Harrison Street
Room 1158
Brownsville, TX 78520

    No. 20-40869   USA v. Mesquias
                 USDC No. 1:18-CR-8-1

Dear Mr. Ochsner,

Enclosed is a copy of the Supreme Court order denying certiorari.

                 Sincerely,

                 LYLE W. CAYCE, Clerk

      By:     _____
                 Stacy Carpenter Vial, Deputy Clerk

United States Courts
Southern District of Texas
FILED

*October 04, 2022*

Nathan Ochsner, Clerk of Court

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

October 3, 2022

Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130



Re:  Henry McInnis
v. United States
No. 21-1589
(Your No. 20-40869)
1:18-cr-8-2

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

*Scott S. Harris*

**Scott S. Harris, Clerk**

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

October 04, 2022

Mr. Nathan Ochsner
Southern District of Texas, Brownsville
United States District Court
600 E. Harrison Street
Room 1158
Brownsville, TX 78520

     No. 20-40869    USA v. Mesquias
                   USDC No. 1:18-CR-8-1

Dear Mr. Ochsner,

Enclosed is a copy of the Supreme Court order denying certiorari.

               Sincerely,

               LYLE W. CAYCE, Clerk

       By:   _Stacy Vial_____
            Stacy Carpenter Vial, Deputy Clerk