```
1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                      BROWNSVILLE DIVISION

3
     UNITED STATES OF AMERICA      )
4                                  )
                                   )
5    VS.                           ) CRIMINAL ACTION NO.
                                   ) B-18-CR-8
6                                  )
     RODNEY MESQUIAS, HENRY        )
7    MCINNIS AND FRANCISCO PENA    )
                                   )
8

9
                         TRIAL - DAY NINE
10              BEFORE THE HONORABLE ROLANDO OLVERA
                         NOVEMBER 1, 2019
11

12

13                     A P P E A R A N C E S

14
      FOR THE UNITED STATES:
15
         MR. KEVIN LOWELL
16       MR. ANDREW SWARTZ
         MR. JACOB FOSTER
17       ASSISTANT UNITED STATES ATTORNEY
         BROWNSVILLE, TEXAS 78520
18

19    FOR THE DEFENDANT RODNEY MESQUIAS:

20       MR. CHARLES BANKER
         ATTORNEY AT LAW
21       118 Pecan Boulevard
         McAllen, Texas 78501
22
         MR. HECTOR CANALES
23       MR. TONY CANALES
         ATTORNEYS AT LAW
24       2601 Morgan Avenue
         Corpus Christi, Texas 78405
25
```

GOVERNMENT EXHIBIT 2

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2       MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
 3       1000 E. Madison Street
         Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
         MR. ROBERT GUERRA
 6       ATTORNEY AT LAW
         55 Cove Circle
 7       Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9       MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Thank you, everyone.  Please be
 2   seated.
 3              Ladies and gentlemen, welcome back.
 4              I understand that one of you had a slight
 5   emergency that caused some tardiness, but thank you for
 6   being here.
 7              Let's proceed.
 8              MR. LOWELL:  Good morning, Your Honor.
 9              The United States calls Michael Petron.
10              THE COURT:  Please remain standing, sir.
11   We'll swear you in.
12              THE CLERK:  Please raise your right hand.
13              (WITNESS SWORN IN.)
14              THE WITNESS:  I do.
15              THE COURT:  Thank you, sir.
16              Please make yourself comfortable, position
17   the microphone closely to you and speak loudly and
18   clearly into the microphone.
19              THE WITNESS:  Yes, sir.
20              THE COURT:  Thank you, sir.
21              MR. LOWELL:  May I proceed?
22              THE COURT:  Please.
23                      DIRECT EXAMINATION
24   BY MR. LOWELL:
25      Q.  Good morning.  Please introduce yourself to the
```

```
 1   jury.
 2       A.   Good morning.   My name is Michael Petron, spelled
 3   P-e-t-r-o-n.
 4       Q.   Mr. Petron, what is your current occupation?
 5       A.   I'm a managing director at a consulting firm
 6   named Stout.
 7       Q.   Could you walk through your education.
 8       A.   Sure.  I have an undergraduate degree with a
 9   double major in economics and statistics, I have one
10   Master's Degree in Statistics and one Master's Degree in
11   Accounting.
12       Q.   How about your professional qualifications?
13       A.   I am a certified public accountant, licensed in
14   the Commonwealth of Virginia and I'm also a certified
15   fraud examiner.
16       Q.   How about speaking engagements?
17       A.   I've had numerous speaking engagements over the
18   years.  At least, I'd say, 20 to 30 speaking engagements
19   across the country, generally speaking to law
20   enforcement and to the United States attorneys offices.
21       Q.   You work for a company called Stout; is that
22   right?
23       A.   I do.
24       Q.   And how many people do you manage at Stout?
25       A.   About 115 people.
```

1  Q.  Have you assisted the Department of Justice in
2  the investigation of this case?
3  A.  I have.
4  Q.  When did you start?
5  A.  Would have been sometime in the fall, say of
6  October 2017.
7  Q.  And have you worked on other health care fraud
8  investigations?
9  A.  I have.
10  Q.  Approximately, how many?
11  A.  100, 150.  I'm not sure.
12  Q.  Now, have you been retained by the Government
13  before to testify as a witness?
14  A.  I have.
15  Q.  And have you been retained by the private sector
16  as a witness?
17  A.  I have.
18  Q.  How many times have you testified in federal
19  court in criminal cases?
20  A.  Give or take, 20.
21  Q.  Focusing on this case, when were you retained?
22  A.  In the fall, so October 2017.
23  Q.  And what were you retained to do?
24  A.  A few different things.  I was retained to
25  examine financial records, so probable -- primarily bank

```
 1      Q.   For the Merida Group?
 2      A.   Correct.
 3      Q.   For Francisco Pena?
 4      A.   Yes.
 5      Q.   Now, when you went through the Medicare data,
 6   what did you do?
 7      A.   Well, first and foremost I upload the Medicare
 8   data into data basis on my platform, and then, from
 9   there, I will summarize that information depending upon
10   whatever characteristics are asked of me.
11      Q.   How voluminous was -- were the claims data and
12   banking in this case?
13      A.   Extensive.  I believe the claims data was over
14   800,000 records and we had 3500 - 4,000 pages of bank
15   records.
16      Q.   Did you prepare exhibits in this case?
17      A.   I did.
18      Q.   What kind of exhibits?
19      A.   They're referred to as summary exhibits.
20      Q.   And are those summary exhibits based on your
21   analysis of the claims data?
22      A.   That's correct.
23      Q.   Your analysis of the banking records?
24      A.   Correct.
25      Q.   Could we call up Government's Exhibit L-1
```

```
 1      Q.   Those are patients of the Merida Group?
 2      A.   Correct.
 3      Q.   In Laredo?
 4      A.   Correct.
 5      Q.   How about Dr. Virlar and patients in San Antonio?
 6      A.   The same holds true there where Dr. Virlar is the
 7  attending physician for a number of Medicare
 8  beneficiaries in the San Antonio area.
 9      Q.   How about Dr. Carrillo and Merida Group patients
10  in the Valley?
11      A.   Mr. Carrillo is present in the Merida Group for
12  those patients in the Valley.
13      Q.   Can you pull up H-15 together with H-8.
14           Now, Mr. Petron, focusing on your analysis of the
15  claims data, how much money -- could you tell the jury
16  how much money the Merida Group billed?
17      A.   The Merida Group billed a little over
18  $152,000,000.
19      Q.   152,000,000?
20      A.   $152,000,000.
21      Q.   Across the State of Texas?
22      A.   This is even broader than the State of Texas,
23  my -- my map I restricted to the State of Texas, but I
24  think there are about 300 beneficiaries or patients
25  outside of the State of Texas.
```

1    Q.   So it doesn't include everybody?
2    A.   This map does not include everyone.
3    Q.   Now, based on your analysis of the claims data,
4  how much was paid to the Merida Group on those
5  150,000,000 -- approximately, $150,000,000 in bills?
6    A.   It's about $124,000,000, if memory serves.
7    Q.   And where was that money deposited?
8    A.   Into various Merida Group bank accounts.
9    Q.   And who controlled the Merida Group's corporate
10 bank accounts?
11   A.   By and large, Mr. Mesquias.
12   Q.   And based on your analysis of the Medicare
13 documents, during what timeframe did he control those
14 accounts?
15   A.   I had access to the banking records from,
16 approximately, 2011 through 2018, and he was the
17 signatory on those accounts for those time periods.
18   Q.   And prior to that, did you also have access to
19 Medicare -- certain Medicare records?
20   A.   I had access to Medicare records going back to
21 2009, but no banking records before 2011.
22   Q.   Okay.  And do those records pre-2011, do they
23 include EFT agreements?
24   A.   Correct.
25   Q.   And what are EFT agreements?

```
 1   with Government's Exhibit L-2.
 2        A.  So on the right, on Exhibit H-10, we have a
 3   summary of Medicare billed and paid amounts where
 4   Dr. Carrillo was the attending physician.  So you can
 5   see that there are a total of 147 unique beneficiaries,
 6   441 claims with over $1.9 million billed and $1.3
 7   million paid.
 8        Q.  Let's pull up Government's Exhibit H-11 together
 9   with L-2.
10        A.  This a summary of where Dr. Pena was the
11   attending physician, we briefly, I think, looked at this
12   already where Dr. Pena primarily in Professional Hospice
13   and Virtue Home Health had 123 beneficiaries, 986
14   claims, 4.5 million billed, 3.1 million paid.
15        Q.  Let's please pull up L-2 together with H-12.
16        A.  H-12 changes the summary to focus more on
17   Dr. Virlar in the San Antonio area.  Dr. Virlar had a
18   total of 833 beneficiaries, almost 4,000 claims with
19   over $17,000,000 billed and over $13,000,000 paid for
20   those Merida Group patients.
21        Q.  So among the three doctors that worked for Rodney
22   Mesquias, among those three depicted in the map, was
23   Dr. Virlar the top doctor?
24        A.  By far.
25        Q.  Let's go to H-14, please, together with L-2.
```

```
 1      Q.   Here it is, sorry.  H-9.
 2           And what I want to focus in on here is this
 3   column here, number of beneficiaries and the provider
 4   name.  All right, so we have a series of -- of both
 5   hospices and -- and plus home health care companies,
 6   right?
 7      A.   Correct.
 8      Q.   And -- and, sir, are you -- are you an expert in
 9   the regulations, the CFRs and the statutes on home
10   health care and hospice?
11      A.   I'm not.
12      Q.   Okay.  All right.  But you know the difference
13   between a hospice and a home health care?
14      A.   I do.
15      Q.   Okay.  And you know here, what we're summarizing
16   here are the -- we have two types of providers here, we
17   have a hospice provider and a home health provider,
18   right?
19      A.   Correct.
20      Q.   Two different types of patients, right?
21      A.   Correct.
22      Q.   Okay.  And so here they all are on the left.  And
23   we're dealing with a total number of beneficiaries, is
24   that -- just so to make sure our lingo is right,
25   beneficiaries are patients, right?
```

1    A.   Right.
2    Q.   Beneficiaries they're Medicare beneficiaries,
3 right?
4    A.   Specific to Medicare, correct.
5    Q.   So in the claims world, in your world, the --
6 they're not patients, they're beneficiaries?
7    A.   That's just in my world what they're called, yes.
8    Q.   Right.  Okay.  All right.  Now, we're -- just
9 making sure our lingo was on the same page.
10        So we're talking about a total, the total
11 universe of patients, 9,339 patients, right?
12   A.   That is correct.
13   Q.   And that's where this -- this $100,000,000 figure
14 comes from, right, are these here?  You've got them
15 right here, it's even more than that, 150 and 124?
16   A.   Correct.  The 152,000,000 is how much was billed
17 to the Medicare program and Medicare paid $124,000,000.
18   Q.   All -- all of those, all of those.
19   A.   Correct, all of those.
20   Q.   And -- and so, sir, can you -- what percentage --
21 now, you did not -- out of these nine -- 9300 patients,
22 you didn't conduct a random representative sample out of
23 those patients; did you?
24   A.   I did not.
25   Q.   And it -- as a statistician, you know that in

```
 1  following day.
 2              MR. TONY CANALES:  Yes, Your Honor.
 3              MR. GUERRA:  Yes.  We understand Dr. Pena,
 4  we've been working with the Government when it's our
 5  turn.
 6              THE COURT:  All right, gentlemen.
 7              Anything else?
 8              MR. TONY CANALES:  No, thank you.
 9              MR. LOWELL:  No, Your Honor.
10              THE COURT:  All right.  Have a nice weekend
11  everyone.
12              MR. LOWELL:  Thank you.
13
14                  REPORTER'S CERTIFICATE
15
16     I certify that the foregoing is a correct transcript
17  from the record of proceedings in the above-entitled
18  matter.
19
20
21                      /s/Sheila E. Perales
                        SHEILA E. HEINZ-PERALES CSR RPR CRR
22                      Exp. Date:  January 31, 2021
23
24
25
```