```
1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION

3
   UNITED STATES OF AMERICA       )
4                                 )
                                  )
5  VS.                            ) CRIMINAL ACTION NO.
                                  ) B-18-CR-8
6                                 )
   RODNEY MESQUIAS, HENRY         )
7  MCINNIS AND FRANCISCO PENA     )
                                  )
8

9
                        TRIAL - DAY THREE
10            BEFORE THE HONORABLE ROLANDO OLVERA
                        OCTOBER 24, 2019
11

12

13                  A P P E A R A N C E S

14
    FOR THE UNITED STATES:
15
        MR. KEVIN LOWELL
16      MR. ANDREW SWARTZ
        MR. JACOB FOSTER
17      ASSISTANT UNITED STATES ATTORNEY
        BROWNSVILLE, TEXAS 78520
18

19  FOR THE DEFENDANT RODNEY MESQUIAS:

20      MR. CHARLES BANKER
        ATTORNEY AT LAW
21      118 Pecan Boulevard
        McAllen, Texas 78501
22
        MR. HECTOR CANALES
23      MR. TONY CANALES
        ATTORNEYS AT LAW
24      2601 Morgan Avenue
        Corpus Christi, Texas 78405
25
```

GOVERNMENT EXHIBIT 3

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2       MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
 3       1000 E. Madison Street
         Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
         MR. ROBERT GUERRA
 6       ATTORNEY AT LAW
         55 Cove Circle
 7       Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9       MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   thank everyone again for their promptness.  Let's get --
 2   let's get started.
 3              Mr. Lowell, next witness, please.
 4              MR. LOWELL:  Good afternoon, Your Honor.
 5   The United States calls Eduardo Carrillo.
 6              THE COURT:  Good afternoon, sir.
 7              THE WITNESS:  Good afternoon.
 8              THE COURT:  Please remain standing, we're
 9   going to swear you in.
10              (WITNESS SWORN IN.)
11              THE WITNESS:  I do.
12              THE COURT:  Thank you, sir.  Please have a
13   seat, make yourself comfortable.  Be careful to position
14   the microphone closely to your mouth.  Please speak
15   loudly and clearly throughout your testimony.
16              Mr. Lowell, please proceed.
17              MR. LOWELL:  Thank you, Your Honor.
18                       DIRECT EXAMINATION
19   BY MR. LOWELL:
20      Q.  Good afternoon.  Please state your name for the
21   record.
22      A.  Eduardo Carrillo.
23      Q.  And Mr. Carrillo, what state do you currently
24   live in?
25      A.  In Louisiana.
```

```
 1   using that narcotic and very quickly I became addicted
 2   to it.
 3        Q.   Was that an opioid?
 4        A.   Yes, it's an opioid.
 5        Q.   Are you clean today?
 6        A.   Yes.  I've been sober for four years.
 7        Q.   Now, as part of your cooperation, did you meet
 8   with the Government?
 9        A.   Yes, sir.
10        Q.   Did you meet with the Government multiple times?
11        A.   Yes.
12        Q.   And during your meetings with the Government, did
13   you discuss your involvement in fraud?
14        A.   Yes.
15        Q.   And I want to focus on your involvement in fraud
16   at the Merida Group.  Did you commit fraud when you were
17   at the Merida Group?
18        A.   Yes.
19        Q.   And you were a medical director; is that right?
20        A.   That's correct.
21        Q.   And were you assigned to a specific region in
22   Texas?
23        A.   Yes.
24        Q.   Take a look at Government's Exhibit L-2, please.
25   Mr. Carrillo, where on this map were you assigned?
```

```
 1      Q.  Did you participate with Rodney Mesquias in that
 2   fraud?
 3      A.  Yes.
 4      Q.  Did you participate with Henry McInnis in that
 5   fraud?
 6      A.  Yes.
 7      Q.  I want to talk about that fraud.  As part of that
 8   fraud, Mr. Mesquias -- or Mr. Carrillo, did you falsify
 9   patient files for the Merida Group?
10      A.  Yes, I did.
11      Q.  At whose direction?
12      A.  At the direction of Rodney Mesquias and Henry
13   McInnis and Joe Garza.
14      Q.  And who is Joe Garza?
15      A.  He was the -- I believe the director of nursing
16   at the time.
17      Q.  And as a part of that fraud, did you sign up
18   patients for hospice who were not dying?
19      A.  Yes, I did.
20      Q.  At whose direction?
21      A.  At their direction.
22      Q.  Who's their?
23      A.  Joe Garza, Henry McInnis and Rodney Mesquias.
24      Q.  As a part of the fraud at the Merida Group, did
25   you sign up patients for home health who were not
```

```
 1    homebound?
 2        A.   Yes, I did.
 3        Q.   At whose direction?
 4        A.   At the direction of the leadership:  Henry
 5    McInnis, Rodney Mesquias and Joe Garza.
 6        Q.   And as part of the fraud at the Merida Group, did
 7    you refer patients to the Merida Group in exchange for
 8    kickbacks?
 9        A.   Yes.
10        Q.   And who paid you the kickbacks?
11        A.   The Merida Home Health or Health Care Group.
12        Q.   Did it also include the hospice companies?
13        A.   Yes.
14        Q.   Now, I want to focus, Mr. Carrillo, on the very
15    beginning period after you were first hired as a medical
16    director.  Do you recall getting a list of,
17    approximately, 30 patients?
18        A.   Yes.
19        Q.   Did you see the patients?
20        A.   Yes, I did.
21        Q.   And did you turn in doctor's orders to the Merida
22    Group?
23        A.   Yes, I did.
24        Q.   And was that the location in Harlingen?
25        A.   Yes.
```

```
 1        Q.   What were you being paid for?
 2        A.   I was being paid to falsely certify patients,
 3   certifying that they would pass away within six months
 4   of the -- of the date that I visited them, and I was
 5   being paid also to refer patients for hospice and home
 6   health.
 7        Q.   Okay.  So your job had a couple different parts.
 8   Part of your job was to falsify records; is that right?
 9        A.   Yes.  Yes.
10        Q.   And the other part of your job was to refer
11   patients in exchange for kickbacks?
12        A.   Yes.
13        Q.   Now, these doctor's orders that you signed, what
14   are they referred to as?
15        A.   They're referred to as face-to-face encounters.
16        Q.   And were you paid for every face-to-face
17   encounter that you signed?
18        A.   Yes.
19        Q.   Now, if you were -- if you didn't sign a
20   face-to-face order, would you be paid?
21        A.   No.
22        Q.   Would it be fair to say that you were
23   incentivized to sign these doctor's orders?
24        A.   Yes.
25        Q.   How so?
```

1    A.   Yes, it is.
2    Q.   And you were a doctor at the time, right?
3    A.   Yes.
4    Q.   You were a medical director for the Merida Group?
5    A.   Yes.
6    Q.   At the time you signed this document, was this
7    during the fraud that you were committing at the Merida
8    Group?
9    A.   Yes.
10   Q.   And the order that Dr. Pena signed, he signed
11   that after you, right?
12   A.   Yes, he signed it in September.
13   Q.   A few months later?
14   A.   Yes.
15   Q.   Standing here today, do you have any idea whether
16   Francisca Perez is still alive?
17   A.   No.
18   Q.   Now, on the hospice side of the Merida Group,
19   what portion of the patients, based on your experience,
20   you saw patients, right?
21   A.   Yes.
22   Q.   What portion of the patients, what percentage of
23   the patients didn't qualify for hospice?
24   A.   Of the hundreds of patients that I saw, I'd say
25   more than 80 percent of the patients did not qualify for

```
 1    hospice.
 2         Q.    More than 80 percent of the patients didn't
 3    qualify for hospice; is that right?
 4         A.    Yes.
 5         Q.    And you're in San Antonio; is that correct?
 6         A.    I -- this included the patients that I saw in the
 7    Rio Grande Valley, San Antonio and Laredo and Corpus.
 8         Q.    All over the place?
 9         A.    Yes.
10         Q.    Not just six or seven patients, right?
11         A.    Correct.
12         Q.    Now, how if at all did that benefit the Merida
13    Group?
14         A.    Well, it increased -- it increased -- it not only
15    increased their patient census, but also expanded their
16    geographical reach.  It benefited them financially,
17    their gross revenues increased, it meant more money for
18    Merida as well as to Rodney Mesquias and Joe McInnis and
19    of course myself.
20         Q.    So you mentioned geographical reach, what do you
21    mean by that?
22         A.    What -- what I mean is they expanded to different
23    counties in Texas, it increased the patient numbers
24    within those counties as well, for example they were
25    able to see more patients in -- in San Antonio, and the
```

```
 1   told me that as long as I spoke to them via phone and
 2   consult them via telephone, I can do a certification.
 3      Q.   You didn't have to see them?
 4      A.   I didn't have to see them.
 5      Q.   Was that based on Henry McInnis's directive?
 6      A.   Yes.
 7      Q.   Did you follow Henry McInnis's directives?
 8      A.   Yes.
 9      Q.   And Henry McInnis was the number two at the
10   company; is that right?
11      A.   Yes.
12      Q.   He was based in Harlingen?
13      A.   Yes.
14      Q.   Now, we talked about hospice, I want to pivot and
15   talk a little bit about the Merida Group, their home
16   health services.  You also worked in the home health
17   side; is that correct?
18      A.   Yes.
19      Q.   And just as with hospice, Merida Group's hospice
20   operation, did you lie about patients on the home health
21   side?
22      A.   Yes, I did.
23      Q.   Tell the jury what you lied about?
24      A.   Well, for one thing the majority of the forms
25   that I had to fill out, that I was asked to fill out for
```

1  the home health, these forms are -- are referred to as
2  485's, I signed these forms without seeing -- ever
3  seeing the patients.  These -- usually when I would
4  visit, or go to the Merida offices on Fridays to pick up
5  my check for the hospice certifications, I would be
6  given a -- a pile of 485's, usually by a nurse or
7  Mr. Joe Garza, for me to sign.  And I would sign them
8  without seeing the patients.
9      Q.  Why did you sign false doctor's orders for home
10 health patients at Merida?
11     A.  Because -- I signed them because I -- I felt that
12 if I didn't sign them, I wouldn't receive my paycheck
13 for that -- for those certifications.
14     Q.  Now, these Merida Group patient files, would you
15 add false diagnoses to these records?
16     A.  Yes.
17     Q.  What is failure to thrive?
18     A.  That's a -- that's a medical term given to a
19 patient that -- who despite the patient's effort to --
20 despite the patient's effort to gain weight, the patient
21 doesn't gain weight, even though the patient is eating,
22 there's no -- the patient doesn't thrive, the patient
23 doesn't gain -- gain weight, that's failure to thrive.
24     Q.  Now, the failure to thrive diagnosis, was that a
25 false diagnosis that you would add to the Merida Group

```
 1  page?
 2     A.  Yes, I do.
 3     Q.  And what's the date?
 4     A.  It's April the 9th, 2015.
 5     Q.  And April 9th, you said 2015 or 2016?
 6     A.  2015.
 7     Q.  April 9th, 2015, did you certify that Joanne
 8  Conti was about to die?
 9     A.  Yes, I did.
10     Q.  And was this during the time that you were
11  committing health care fraud at the Merida Group?
12     A.  Yes.
13     Q.  Now, Mr. Carrillo we've -- we've talked about
14  these patient files, we've walked through a couple of
15  them.  Based on your -- your experience at the Merida
16  Group as a medical director, you were someone who
17  reviewed the files; is that right?
18     A.  Yes.
19     Q.  Did the Merida's Group medical records contain
20  truthful information?
21     A.  No.
22     Q.  Was it common to see false information in the
23  patient files?
24     A.  Yes.
25     Q.  How common?
```

```
 1     A.   Very common, pretty much every single patient.
 2               MR. LOWELL:  Your Honor, we'll pass the
 3   witness.
 4               THE COURT:  Gentlemen, one second,
 5   Mr. Banker, we need a quick break?
 6               Let's go ahead and take a break before we
 7   start the -- the cross.
 8               COURT OFFICER:  All rise for the jury.
 9               (JURY OUT.)
10               (COURT IN SHORT RECESS.)
11               THE COURT:  Please remain standing for the
12   jury.
13               (Brief pause in proceedings.)
14               COURT OFFICER:  All rise for the jury.
15               (JURY IN.)
16               THE COURT:  All right.  Thank you, everyone.
17   Please be seated.
18               We have Mr. Banker now, correct.
19               MR. BANKER:  That's right, Judge, may it
20   please the Court.
21               THE COURT:  Please proceed when you're
22   ready.  And, yes, sir.
23               And again, just a quick reminder, I know
24   it's difficult, but please remember to speak loudly and
25   clearly into the microphone.
```

```
 1              COURT REPORTER:  Thank you.
 2                  (COURT IN RECESS.)
 3
 4                  REPORTER'S CERTIFICATE
 5
 6    I certify that the foregoing is a correct transcript
 7   from the record of proceedings in the above-entitled
 8   matter.
 9
10
11                          _____
                            SHEILA E. HEINZ-PERALES CSR RPR CRR
12                          Exp. Date:  January 31, 2021
13
14
15
16
17
18
19
20
21
22
23
24
25
```