```
                 IN THE UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
                         BROWNSVILLE DIVISION


UNITED STATES OF AMERICA         )
                                 )
                                 )
VS.                              )  CRIMINAL ACTION NO.
                                 )  B-18-CR-8
                                 )
RODNEY MESQUIAS, HENRY           )
MCINNIS AND FRANCISCO PENA       )
                                 )


                       TRIAL - DAY SEVEN
              BEFORE THE HONORABLE ROLANDO OLVERA
                        OCTOBER 30, 2019



                    A P P E A R A N C E S


 FOR THE UNITED STATES:

     MR. KEVIN LOWELL
     MR. ANDREW SWARTZ
     MR. JACOB FOSTER
     ASSISTANT UNITED STATES ATTORNEY
     BROWNSVILLE, TEXAS 78520


 FOR THE DEFENDANT RODNEY MESQUIAS:

     MR. CHARLES BANKER
     ATTORNEY AT LAW
     118 Pecan Boulevard
     McAllen, Texas 78501

     MR. HECTOR CANALES
     MR. TONY CANALES
     ATTORNEYS AT LAW
     2601 Morgan Avenue
     Corpus Christi, Texas 78405
```

GOVERNMENT EXHIBIT 4

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2       MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
 3       1000 E. Madison Street
         Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
         MR. ROBERT GUERRA
 6       ATTORNEY AT LAW
         55 Cove Circle
 7       Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9       MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                COURT OFFICER:  All rise for the jury.
 2                (JURY IN.)
 3                THE COURT:  Thank you, everyone.  Please be
 4   seated.  Good morning.
 5                Ladies and gentlemen of the jury, good
 6   morning, and thank you for your promptness.
 7                Gentlemen?  Mr. Lowell?
 8                MR. LOWELL:  Good morning, Your Honor.
 9   Thank you.
10                The United States calls Jesus Virlar.
11                THE COURT:  Please remain standing, sir.
12   Raise your right hand.
13                (WITNESS SWORN IN.)
14                THE WITNESS:  Yes, ma'am.
15                THE CLERK:  Thank you.
16                THE COURT:  Thank you, sir.
17                Sir, please make yourself comfortable and
18   position the microphone closely to you, and speak loudly
19   and clearly into the microphone.
20                Mr. Lowell, please proceed.
21                MR. LOWELL:  Thank you, Your Honor.
22                       DIRECT EXAMINATION
23   BY MR. LOWELL:
24      Q.  Good morning, please state your name for the
25   record.
```

1    A.   My name is Jesus Alfredo Virlar Cadena.
2    Q.   Do you currently live in Texas?
3    A.   Yes, I live in San Antonio half of the week and
4    the rest in Laredo, Texas with my parents.
5    Q.   And were you a doctor?
6    A.   Yes, graduated --
7    Q.   How long?
8    A.   I graduated from University of Texas Medical
9    Branch in 2000, did my residency in Indiana University
10   from '01 to 2003, and then relocated back to
11   San Antonio.
12   Q.   As a doctor, where did you practice primarily?
13   A.   In the hospital setting at Main Methodist
14   Hospital, the Baptist Facilities, Santa Rosa Facilities,
15   Nix Hospital, Southwest General Hospital, as well as
16   some nursing home facilities.
17   Q.   Mr. Virlar, what do you currently do for a
18   living?
19   A.   Currently, I'm in the automotive business with my
20   family, Collision Parts and Managing Collision Center.
21   Q.   Did you previously work for the Merida Group?
22   A.   Yes, I did.
23   Q.   Were you one of the medical directors there?
24   A.   Yes, sir.
25   Q.   Approximately, what timeframe?

```
 1   health care fraud?
 2       A.   I agreed to health care fraud with my partner
 3   Rodney Mesquias, my partner Henry McInnis, as well as
 4   clinicians that were part of my group.
 5       Q.   In addition to those individuals, did you also
 6   agree to commit health care fraud with Francisco Pena?
 7               MR. GUERRA:   Objection, Your Honor, leading.
 8               THE COURT:   Rephrase the question.
 9               Who were the other clinicians?
10       Q.   (By Mr. Lowell)  Who were the other clinicians?
11       A.   Other medical directors at Merida included
12   Vicente Gonzaba, Benjamin Zertuche, Dr. Francisco
13   Martinez, as well as Dr. Posada, and other physicians
14   that I would hear the names about, but I do not recall.
15       Q.   In addition to those individuals, who, if anyone
16   in Laredo, did you agree to commit with -- health care
17   fraud with?
18       A.   Could you be more specific, please?
19       Q.   Yes.  Focusing on Laredo, what, if any -- who, if
20   anyone in the medical profession, did you agree to
21   commit health care fraud with?
22       A.   With Dr. Francisco Pena.
23       Q.   Now, were there different ways that you and your
24   co-conspirators committed health care fraud?
25       A.   Yes, we would falsify the clinical information in
```

```
 1    the charts so that it will look as if the patient
 2    appears sicker than they really truly are so that they
 3    would meet hospice criteria.
 4        Q.   So to be clear, Mr. Virlar, did you sign up
 5    patients who were not dying for hospice?
 6        A.   Yes, I did.
 7        Q.   As a part of that conspiracy, did you sign up
 8    patients who were not homebound for home health?
 9        A.   Yes, I did, multiple.
10        Q.   As a part of that conspiracy, did you cause false
11    claims to be submitted to Medicare?
12        A.   Yes, I did, multiple.
13        Q.   As a part of that conspiracy, did you manufacture
14    fake records that were sent to the Grand Jury?
15        A.   Yes, I did, multiple.
16        Q.   What's the purpose of sending those fake records
17    to the Grand Jury?
18        A.   They were, essentially, attempt to cover up the
19    fraudulent fraud that we were committing on those
20    patients.
21        Q.   When you mean cover up the fraud, explain to the
22    jury what you mean by that?
23        A.   Basically, we were saying that the patients were
24    sick by documenting false diagnosis, false clinical
25    objective findings, and since the Grand Jury requested
```

1  more records to verify if that was truly real, we went
2  ahead and manufactured more medical records stating that
3  on certain visits, at certain times these patients were
4  examined when, in fact, they had not been examined.  So
5  what was written on those charts was completely copied
6  from previous fake medical records.
7     Q.   Was it part of the conspiracy to receive
8  kickbacks in exchange for patient referrals?
9     A.   Yes, very common.
10    Q.   Was it part of the conspiracy -- conspiracy to
11 conceal your ownership --
12           MR. HECTOR CANALES:  Objection, Your Honor,
13 objection, Your Honor, also calls for lead -- leading
14 question.
15           THE COURT:  Well, let me hear the entirety
16 of the question.  Let me hear the question, I didn't
17 hear -- and, sir, again, position the mic close to you.
18 You can move the base if that helps you.
19    Q.   (By Mr. Lowell)  As a part of the conspiracy,
20 what, if anything, did you do to conceal your ownership
21 in a company, the Merida Group Company?
22    A.   I placed the ownership of the company under my
23 then current girlfriend Micaela Wood.
24    Q.   How old was your girlfriend at the time?
25    A.   She was 19.

```
 1   hospice criteria.
 2       Q.   So Dr. Virlar, just to be clear, would you lie in
 3   those patient files?
 4       A.   Yes, I would.
 5       Q.   Were you paid to be a real doctor?
 6       A.   No, I was not.
 7       Q.   Were you paid to promote the fraud at the Merida
 8   Group?
 9            MR. HECTOR CANALES:  Objection, Your Honor,
10   leading.
11            THE COURT:  That's overruled.
12       Q.   (By Mr. Lowell)  You may answer.
13       A.   Oh, yes, I was.
14       Q.   How were you paid to promote the fraud?
15       A.   I would receive a medical directorship of $5,000
16   a month, as well as a quarterly bonus, so the more
17   patients that I would refer, the bigger that quarterly
18   bonus, that would be my incentive.  Also, our trips to
19   Vegas, trips to Napa, and as well as $300 for gym
20   membership at Gold's when I was in Laredo.
21       Q.   Mr. Virlar, are you familiar with the term
22   prognosis?
23       A.   Yes, I am, sir.
24       Q.   As a medical director with the Merida Group, were
25   you paid to give a truthful prognosis for patients?
```

1  A.  No, I was not.
2  Q.  Were you paid to give a truthful diagnosis?
3  A.  No, I was not.
4  Q.  Could we please pull up Government's Exhibit L-3.
5      Now, Mr. Virlar as a doctor for the Merida Group,
6  did you routinely have conservations with Rodney
7  Mesquias and Henry McInnis?
8  A.  Yes.
9          MR. CYGANIEWICZ:  Objection to the compound
10 question and grouping together the -- the two people.
11 That calls for a vague answer and it's a vague question
12 and a compound question.
13         THE COURT:  Overruled.
14 Q.  (By Mr. Lowell)  You may answer.
15 A.  Yes, I would have multiple conversations via
16 group text with Rodney Mesquias, Mr. Henry McInnis, the
17 marketers and whenever I would refer a patient, I would
18 let them know via text, here's another one, please send
19 your marketer as soon as possible because I have other
20 patients.
21      And at one point, we were communicating through
22 an encryption application called Wickr so that if we
23 will be investigated, there will be no trace of it.
24 Q.  You mentioned an encryption application; is that
25 right?

1    A.   That is correct.
2    Q.   And using that encryption application, would you
3  communicate with Rodney Mesquias?
4    A.   Yes, I would, on multiple occasions.
5    Q.   Using that encryption device, would you
6  communicate with Henry McInnis?
7    A.   Yes, I would.
8    Q.   And what, if anything, was the purpose of using
9  the encrypted device to communicate with them?
10   A.   To hide the fraud.
11   Q.   Now, you mentioned earlier that you signed up
12 patients who did not qualify for hospice.  At whose
13 direction did you do that?
14   A.   Rodney Mesquias and Henry McInnis.
15   Q.   What about the home health patients that you
16 qualified for home health fraudulently?  At whose
17 direction did you that?
18   A.   Henry McInnis and Rodney Mesquias.
19   Q.   And with respect to the payments for patient
20 referrals to the Merida Group, who, if anyone, gave you
21 that direction?
22   A.   Could you please repeat the question?
23   Q.   Yes.  With respect to the kickbacks that you
24 received at the Merida Group, who, if anyone, gave you
25 direction that you would receive those kickbacks?

1	A.	I don't understand your question.
2	Q.	You testified earlier that you received kickbacks
3	as part of the health care fraud conspiracy; is that
4	right?
5	A.	That is correct.
6	Q.	And from whom did you get those kickbacks?
7	A.	Oh, from Rodney Mesquias and Henry McInnis.
8	Q.	Now, Mr. Virlar, as part of the conspiracy, did
9	the fraud take place in different towns in Texas?
10	A.	Multiple towns throughout Texas.
11	Q.	And I'm showing you Government's Exhibit L-1,
12	could we pull that up.
13		Mr. Virlar, I want to focus on the towns that are
14	depicted and blown-up there.  And if you -- you can use
15	your finger and you can circle the towns as we go
16	through them.
17		Now, just going through them, could you circle
18	the towns that are depicted and blown-up where you were
19	involved in the fraud, or there was fraud occurring.
20	Could you name them as you circle them?
21	A.	San Antonio, Austin, Eagle Pass, Pearsall,
22	Dilley, Cotulla, Laredo, Houston, Texas City, other
23	towns near Texas City in Galveston, Corpus Christi and,
24	of course, Harlingen.
25		I was also -- I was supposed to travel to El Paso

1   Q. And, sir, is it your testimony here that 100
2   percent of everything in those medical records is
3   fraudulent?
4   A. You can't make that decision because you don't
5   know what is fraudulent and what is not because
6   everybody was, basically, making up fraudulent things.
7   So the integrity --
8   Q. Everybody?
9   A. Nursing staff, marketers, chaplain, medical
10  directors.
11  Q. Oh, everybody?
12  A. For the majority of the part, yes.
13  Q. Okay. Who was it? Was there anybody at
14  Merida -- could you give me a name right now, according
15  to you a name at Merida who you don't think was
16  fraudulent, or -- or is everybody just like you?
17  A. Nursing staff had a --
18  Q. Sir, I'm -- I'm not asking for an explanation, my
19  question is very specific. A name, can you give me a
20  name of a nurse, or a doctor that you think is
21  legitimate?
22  A. No, I can't.
23  Q. All right. So your position is here you want the
24  jury to believe that the -- the whole, everything, the
25  whole ball of wax is bad?

```
 1       A.   The overall majority, yes.
 2       Q.   I'm not saying the overall majority.  All of it?
 3  50 percent of it?  What -- what -- you're saying all --
 4       A.   90 percent.
 5       Q.   90?
 6       A.   90.
 7       Q.   Did you show them the ten percent?
 8       A.   No, I didn't find any in the charts that I had in
 9  front of me.
10       Q.   So you're just guessing about numbers now, what
11  is it?
12       A.   I'm telling you who I interacted with, what I
13  reviewed, and based on everything in front of me,
14  everyone was lying.
15       Q.   Everyone, okay.  That's the -- that's what I want
16  to know.  Everybody's lying?
17       A.   In the charts that I reviewed.
18       Q.   Okay.  All right.  And would that include
19  non-Merida staff?  In other words, doctors and nurses
20  who were not part of Merida, they're all lying, too?
21       A.   Dr. Arizaca was, Dr. Montemayor was, Dr. Vincent
22  and Greg Gonzaba was, Dr. Zertuche was, Nurse
23  Practitioner Cynthia Calvillo was, Nurse Practitioner
24  Rosan Estrada, who had no supervisory position and --
25       Q.   Everybody is a liar?
```

1   Q.   Next page of the invoice actually lists the
2   actual face-to-faces; does it not?
3   A.   Yes, it does.
4   Q.   That all add up to the $8,800?
5   A.   Yes, but sometimes I would not actually see the
6   patients and would just sit down and write the
7   face-to-faces and hand them to Rosie so she could then,
8   basically, submit them for that invoicing.
9   Q.   And that's something in your -- that you would
10  conceal, you would conceal from Merida that -- that if
11  you made a false invoice that you didn't actually go see
12  them?  You kept that to yourself?
13  A.   No, Rosie Avila was aware, Roland Aguilera was
14  aware.
15  Q.   Because everybody, everybody's just like you,
16  right?
17  A.   Everybody was with the same game plan.
18  Q.   And since everybody's with the same game plan,
19  according to you, any -- any record I put up, any
20  medical record I put up, any business record I put up,
21  your answer is going to be same, they were in on it,
22  too, right?
23  A.   I would just question the credibility of any
24  documentation.
25  Q.   Exactly.  Any document I put up you're going to

1              Let's go ahead and break for the day.
2    Again, let's follow the same procedures, please show up
3    promptly before 9:00 and we'll start with the next
4    witness.
5              Everyone have a nice evening.
6              COURT OFFICER:  Please raise for the jury.
7              (JURY OUT.)
8              THE COURT:  All right.  All right.  Thank
9    you, everyone.  We'll be in recess.
10             (COURT IN RECESS.)
11
12                    REPORTER'S CERTIFICATE
13
14     I certify that the foregoing is a correct transcript
15   from the record of proceedings in the above-entitled
16   matter.
17
18
19                      /s/Sheila E. Perales
                        SHEILA E. HEINZ-PERALES CSR RPR CRR
20                      Exp. Date:  January 31, 2021
21
22
23
24
25