IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, <br> ex rel. JANE DOE and JANE ROE <br> Plaintiffs, <br> <br> v. <br> <br> RODNEY YSA MESQUIAS, and <br> HENRY WAYNE MCINNIS <br> Defendants. | § § § § § § § § § § | CIVIL NO. 2:15-CV-208 <br> <br> Judge Nelva Gonzales Ramos |

**AFFIDAVIT OF DATA ANALYST ROBBIE WILLIAMSON
IN SUPPORT OF THE UNITED STATES DAMAGES**

Before me, the undersigned authority, personally appeared Robbie Williamson, who being by me duly sworn, deposed and stated, in Harris County, Texas:

1. "My name is Robbie Williamson. I am over 18 years of age, of sound mind, and capable of making this affidavit.

2. I am currently employed as a Data Analyst with United States Department of Justice Civil Division, Commercial Litigation Branch, Fraud Section, and have been so employed since June 2020. Prior to working for the Civil Fraud Section, I worked as an Auditor in the Civil Division, Affirmative Civil Enforcement of the United States Attorney's Office for the Southern District of Texas, from December 2018 to June 2020. Prior to working for the United States Attorney's Office, I worked as an Investigative Auditor for the Office of the Attorney General, Medicaid Fraud Division, from April 2012 to December 2018.

3. I am a certified fraud examiner, and have been so since June 2015.

4. I have received specialized training from the Centers for Medicare & Medicaid Services, in Baltimore, Maryland, including training in the analysis of Medicare claims data.

GOVERNMENT EXHIBIT 5

5. Through my work as a Fraud Investigator, Auditor, and Data Analyst, I am familiar with the False Claims Act ("FCA") including the FCA treble damages provisions and the civil monetary penalty provisions in 28 C.F.R. § 85.3 and 85.5.

6. In the course of my work for the United States Attorney's Office and the Department of Justice Civil Fraud Division, I have reviewed and analyzed the following items from the criminal trial of Rodney Ysa Mesquias ("Mesquias") in the Brownsville Division of the Southern District to Texas:

   a. Trial Exhibit: H-9 identified as a Medicare Summary Chart.

   b. Trial Exhibits: A18-A, A19-A, A20-A, A21-A, A22-A, A23-A, A24-A, and A26-A, identified as the Medicare claim data supporting the trial summary exhibits, including Trial Exhibit H-9.

   c. Sworn trial testimony via transcript of Michael Petron ("Petron"), including the pages attached as Exhibit A to this affidavit.[1]

7. Following my review and analysis of the materials listed above, I am aware that:

   a. Petron testified at Mesquias' trial that the United States retained him to examine Merida financial records and health care claims data. Petron testified that he summarized voluminous records including hundreds of thousands of records within the Medicare claims data and created summary charts, including criminal trial Exhibit H-9.

   b. In Trial Exhibit H-9, Petron summarized the Medicare claims for nine (9) Merida entities between 2009 and 2018, and showed a total universe of 47,210 claims that resulted Medicare payments of $124,213,530 to Merida.

---

[1] Exhibit A: Excerpts TXSD 1:18-CR-00008 Trial Day 9, Petron, Pgs. 3, 5-7, 10-11, 43.

2

8. Based on my experience, education, and training as Fraud Investigator, Auditor, and Data Analyst, my review of the trial exhibits and the underlying Medicare claims, I have analyzed the Medicare claims to identify from the total universe of Merida Medicare claims, the Medicare claims that identified either Dr. Carrillo or Dr. Virlar as the attending physician. My analysis consisted of the following steps:

   a. First, I identified the unique national provider identifiers ("NPI") for Dr. Carrillo and Dr. Virlar.

   b. Second, I filtered the total Merida universe of claims by the NPIs of Dr. Carrillo and Dr. Virlar to determine the total Medicare payments to Merida for hospice and home health claims with either Dr. Carrillo or Dr. Virlar as the attending physician; a total of $14,551,187.14.

   c. Third, I excluded from the $14,551,187.14, all claims for hospice services for fewer than 90 days of service, a total of $2,206,432.

   d. Fourth, I reduced the remaining $12,344,754 by 20 % to arrive at a single damages total of **$9,875,803** (rounded to the nearest dollar) from **3,463 hospice and home health claims** paid under the NPI of either Dr. Carrillo or Dr. Virlar. The following chart summarizes the analysis steps.

|  | # of Claims | Medicare Payment |
|---|---|---|
| Hospice and home health claims paid under the NPIs of Dr. Carrillo and Dr. Virlar: |  | **$14,551,187** |
| **Reduction** for hospice services less than 90 days: |  | $2,206,432 |
| Hospice claims > 90 days of service + home health paid under the NPIs of Dr. Carrillo and Dr. Virlar: |  | **$12,344,754** |
| **Additional 20 % Reduction** |  | $2,468,950 |
|  |  |  |
| **Total Single Damages** | **3,463** | **$9,875,803** |

9. Following my analysis of the Medicare claims paid under the NPIs of Dr. Carrillo and Dr. Virlar, I calculated the range of civil monetary penalties. My calculation consisted of the following steps:

a. First, I calculated the number of claims submitted prior to November 2, 2015, and multiplied them by the minimum penalty of $5,500 and the maximum penalty of $11,000.

b. Second, I calculated the number of claims submitted after November 3, 2015, and multiplied them by the minimum penalty of $12,537 and the maximum penalty of $25,076. The following chart summarizes the calculations.

| Dates | False Claim Count | CMP per claim (Min) | CMP per claim (Max) | Total MIN | Total MAX |
|---|---|---|---|---|---|
| 1999-11/02/2015 | 213 | $5,500 | $11,000 | $1,171,500 | $2,343,000 |
| 11/3/2015-Present | 3,250 | $12,537 | $25,076 | $40,745,250 | $81,497,000 |
| Grand Total | 3,463 | | | $41,916,750 | $83,840,000 |

10. Following my analysis of the Medicare claims paid under the NPIs of Dr. Carrillo and Dr. Virlar, and my calculation of the single damages and the applicable civil monetary penalties, I have calculated single damages of $9,875,803, treble damages of $29,627,410, and the maximum penalties permitted by law as $83,840,000, for a total of **$113,467,410.00.**"

Signed: _____   Date: 7/20/22
Robbie Williamson
Data Analyst
U.S. DOJ, Civil Fraud Section

SWORN TO AND SUBSCRIBED before me on the 20 day of July, 2022.

_____
Notary Signature

ERIC NICHOLAS MANGIN
Notary ID #132017244
My Commission Expires
May 16, 2023

4

```
            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
                   BROWNSVILLE DIVISION


UNITED STATES OF AMERICA    )
                            )
                            )
VS.                         )   CRIMINAL ACTION NO.
                            )   B-18-CR-8
                            )
RODNEY MESQUIAS, HENRY      )
MCINNIS AND FRANCISCO PENA  )
                            )



                    TRIAL - DAY NINE
        BEFORE THE HONORABLE ROLANDO OLVERA
                   NOVEMBER 1, 2019




                 A P P E A R A N C E S


FOR THE UNITED STATES:

    MR. KEVIN LOWELL
    MR. ANDREW SWARTZ
    MR. JACOB FOSTER
    ASSISTANT UNITED STATES ATTORNEY
    BROWNSVILLE, TEXAS 78520


FOR THE DEFENDANT RODNEY MESQUIAS:

    MR. CHARLES BANKER
    ATTORNEY AT LAW
    118 Pecan Boulevard
    McAllen, Texas 78501

    MR. HECTOR CANALES
    MR. TONY CANALES
    ATTORNEYS AT LAW
    2601 Morgan Avenue
    Corpus Christi, Texas 78405
```

GOVERNMENT EXHIBIT
2:15-cv-208
A

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2       MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
 3       1000 E. Madison Street
         Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
         MR. ROBERT GUERRA
 6       ATTORNEY AT LAW
         55 Cove Circle
 7       Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9       MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Thank you, everyone.  Please be
 2   seated.
 3              Ladies and gentlemen, welcome back.
 4              I understand that one of you had a slight
 5   emergency that caused some tardiness, but thank you for
 6   being here.
 7              Let's proceed.
 8              MR. LOWELL:  Good morning, Your Honor.
 9              The United States calls Michael Petron.
10              THE COURT:  Please remain standing, sir.
11   We'll swear you in.
12              THE CLERK:  Please raise your right hand.
13              (WITNESS SWORN IN.)
14              THE WITNESS:  I do.
15              THE COURT:  Thank you, sir.
16              Please make yourself comfortable, position
17   the microphone closely to you and speak loudly and
18   clearly into the microphone.
19              THE WITNESS:  Yes, sir.
20              THE COURT:  Thank you, sir.
21              MR. LOWELL:  May I proceed?
22              THE COURT:  Please.
23                       DIRECT EXAMINATION
24   BY MR. LOWELL:
25      Q.  Good morning.  Please introduce yourself to the
```

1    Q.   Have you assisted the Department of Justice in
2  the investigation of this case?
3    A.   I have.
4    Q.   When did you start?
5    A.   Would have been sometime in the fall, say of
6  October 2017.
7    Q.   And have you worked on other health care fraud
8  investigations?
9    A.   I have.
10   Q.   Approximately, how many?
11   A.   100, 150.  I'm not sure.
12   Q.   Now, have you been retained by the Government
13 before to testify as a witness?
14   A.   I have.
15   Q.   And have you been retained by the private sector
16 as a witness?
17   A.   I have.
18   Q.   How many times have you testified in federal
19 court in criminal cases?
20   A.   Give or take, 20.
21   Q.   Focusing on this case, when were you retained?
22   A.   In the fall, so October 2017.
23   Q.   And what were you retained to do?
24   A.   A few different things.  I was retained to
25 examine financial records, so probable -- primarily bank

1  accounts and credit card statements, and then the second
2  major area was health care claims data.
3      Q.   Were you hired to make a conclusion in this case?
4      A.   No.
5      Q.   Were you hired to give an opinion about the
6  Defendant's guilt or innocence?
7      A.   No.
8      Q.   What are you summarizing in general?
9      A.   I'm summarizing voluminous data.  So voluminous
10 bank accounts, 12 credit cards, hundreds of thousands of
11 records contained within the Medicare claims data.
12     Q.   Now, have you analyzed every single bank account
13 that Merida Group?
14     A.   I have not.
15     Q.   Every single account of the Defendants?
16     A.   I have not.
17     Q.   Approximately, how many bank accounts did you
18 analyze?
19     A.   35.
20     Q.   For multiple banks?
21     A.   Multiple banks.
22     Q.   Now, you talked about the banking information,
23 how about the claims data, did you also analyze claims
24 data?
25     A.   A ton.

1  Q. For the Merida Group?
2  A. Correct.
3  Q. For Francisco Pena?
4  A. Yes.
5  Q. Now, when you went through the Medicare data,
6  what did you do?
7  A. Well, first and foremost I upload the Medicare
8  data into data basis on my platform, and then, from
9  there, I will summarize that information depending upon
10 whatever characteristics are asked of me.
11 Q. How voluminous was -- were the claims data and
12 banking in this case?
13 A. Extensive. I believe the claims data was over
14 800,000 records and we had 3500 - 4,000 pages of bank
15 records.
16 Q. Did you prepare exhibits in this case?
17 A. I did.
18 Q. What kind of exhibits?
19 A. They're referred to as summary exhibits.
20 Q. And are those summary exhibits based on your
21 analysis of the claims data?
22 A. That's correct.
23 Q. Your analysis of the banking records?
24 A. Correct.
25 Q. Could we call up Government's Exhibit L-1

```
 1     Q.   Those are patients of the Merida Group?
 2     A.   Correct.
 3     Q.   In Laredo?
 4     A.   Correct.
 5     Q.   How about Dr. Virlar and patients in San Antonio?
 6     A.   The same holds true there where Dr. Virlar is the
 7  attending physician for a number of Medicare
 8  beneficiaries in the San Antonio area.
 9     Q.   How about Dr. Carrillo and Merida Group patients
10  in the Valley?
11     A.   Mr. Carrillo is present in the Merida Group for
12  those patients in the Valley.
13     Q.   Can you pull up H-15 together with H-8.
14          Now, Mr. Petron, focusing on your analysis of the
15  claims data, how much money -- could you tell the jury
16  how much money the Merida Group billed?
17     A.   The Merida Group billed a little over
18  $152,000,000.
19     Q.   152,000,000?
20     A.   $152,000,000.
21     Q.   Across the State of Texas?
22     A.   This is even broader than the State of Texas,
23  my -- my map I restricted to the State of Texas, but I
24  think there are about 300 beneficiaries or patients
25  outside of the State of Texas.
```

```
 1      Q.   So it doesn't include everybody?
 2      A.   This map does not include everyone.
 3      Q.   Now, based on your analysis of the claims data,
 4  how much was paid to the Merida Group on those
 5  150,000,000 -- approximately, $150,000,000 in bills?
 6      A.   It's about $124,000,000, if memory serves.
 7      Q.   And where was that money deposited?
 8      A.   Into various Merida Group bank accounts.
 9      Q.   And who controlled the Merida Group's corporate
10  bank accounts?
11      A.   By and large, Mr. Mesquias.
12      Q.   And based on your analysis of the Medicare
13  documents, during what timeframe did he control those
14  accounts?
15      A.   I had access to the banking records from,
16  approximately, 2011 through 2018, and he was the
17  signatory on those accounts for those time periods.
18      Q.   And prior to that, did you also have access to
19  Medicare -- certain Medicare records?
20      A.   I had access to Medicare records going back to
21  2009, but no banking records before 2011.
22      Q.   Okay.  And do those records pre-2011, do they
23  include EFT agreements?
24      A.   Correct.
25      Q.   And what are EFT agreements?
```

```
 1        A.    Right.
 2        Q.    Beneficiaries they're Medicare beneficiaries,
 3   right?
 4        A.    Specific to Medicare, correct.
 5        Q.    So in the claims world, in your world, the --
 6   they're not patients, they're beneficiaries?
 7        A.    That's just in my world what they're called, yes.
 8        Q.    Right.  Okay.  All right.  Now, we're -- just
 9   making sure our lingo was on the same page.
10              So we're talking about a total, the total
11   universe of patients, 9,339 patients, right?
12        A.    That is correct.
13        Q.    And that's where this -- this $100,000,000 figure
14   comes from, right, are these here?  You've got them
15   right here, it's even more than that, 150 and 124?
16        A.    Correct.  The 152,000,000 is how much was billed
17   to the Medicare program and Medicare paid $124,000,000.
18        Q.    All -- all of those, all of those.
19        A.    Correct, all of those.
20        Q.    And -- and so, sir, can you -- what percentage --
21   now, you did not -- out of these nine -- 9300 patients,
22   you didn't conduct a random representative sample out of
23   those patients; did you?
24        A.    I did not.
25        Q.    And it -- as a statistician, you know that in
```